GORDON M. EVANS, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 88261.   Promulgated December 16, 1938.

*J. Lee Boothe, C. P. A.,* for the petitioner.
*Stanley B. Anderson, Esq.,* for the respondent.

OPINION.

TURNER: Respondent contends that the option agreement between the petitioner and his employer, the Kelvinator Corporation, constituted an agreement for the payment of additional compensation and that the difference between the price paid for the shares of stock and their fair market value on the date of delivery was taxable income for the year 1934, in which the shares of stock were actually acquired. The petitioner contends that there was a bona fide purchase of the stock and that there was no realization of gain unless and until the shares of stock were disposed of at a profit. For the purpose of determining percentage of gain recognized as the result of the sale of 1,000 shares of the said stock on December 1, 1934, the parties are also in dispute as to the period the stock was held by the petitioner.

In 1929 the petitioner was serving as an executive of the Kelvinator Corporation. On September 13 of that year he was advised that the corporation had authorized a stock participation plan for a selected list of its executives and that under that plan he would be entitled to purchase 3,000 shares of Kelvinator Corporation stock at $10 per share, which at that time was less than its fair market value. He was advised that this offer was being made because it was recognized that the success of the company was assured only through the "tireless and united efforts of its executive personnel, continuously applied", and as additional and separate consideration for his continued best efforts in the service of the company. It was also stated, however, that the acceptance or rejection of the offer was a matter of personal decision on the part of the employee and that the offer was not made in lieu of salary and its acceptance was to be considered as a separate and additional agreement which in no way conflicted with the existing relations.

Up to August 1, 1931, the petitioner had not acquired any of the shares of stock under the plan and on that date he received a further communication from the corporation advising that the plan had been renewed or extended for a period of three years to December 1, 1934. The difference between the original offer of September 13, 1929, and the extended offer of August 1, 1931, was to be found in the proposal under the extended plan to make credits to employees on December 1 of each year of a proportionate part of the corporate earnings. These

earnings were to be credited to the account of the employee and were to be applied in his behalf in payment on the purchase price of the stock. An employee had the right to receive on demand the number of shares which could be purchased by the total earning credits which had up to that time been actually "applied" to his account, but in that event would have no further right to purchase stock or receive earning credits. The price the employee was required to pay still remained at $10 per share, and on August 28, 1931, when petitioner noted his acceptance of the extended plan, the fair market value of Kelvinator Corporation stock was $10.62½ per share. It is also to be noted that on March 29, 1933, when the purchase price of the stock was reduced to $8 per share, the fair market value of the stock was $4.50.

We recently had occasion in *Delbert B. Geeseman*, 38 B. T. A. 258, to consider a transaction substantially similar to the transaction here and held that it was what its form indicated, a purchase of stock by the employee, and not the payment of compensation by the employer corporation. Here, as in the *Geeseman* case, the acceptance of the offer by the petitioner did not change his contract of employment and his continued employment was not dependent upon the agreement to purchase the stock. It is true that the extended plan outlined in the letter of August 1, 1931, was to some extent different from the original plan and there was some statement that it was designed "to compensate those who continue to give the company their best efforts until December 1, 1934." As we pointed out in the *Geeseman* case, however, the hope and desire that the acquisition of stock by a selected group of employees would stimulate the interest and efforts of those employees in the business of the company were not alone sufficient to stamp a sale of stock to such employees as the payment of compensation merely because the selling price of the stock was fixed at an amount less than its fair market value. It is to be noted here that the extended plan made no change in the price to be paid for the stock, and further, that at the time the offer was accepted by the petitioner on August 28, 1931, the fair market value of the stock was substantially the same as the price to be paid. The fair market value later dropped to an amount less than half of the purchase price originally provided, resulting in a reduction by the corporation of the purchase price from $10 to $8 per share. The only substantial point of difference between the original plan and the extended plan was that the corporation would, through the crediting of a proportion of earnings, provide additional compensation for those executives who had the right to participate in the plan. The petitioner not only makes no contention that the credits made to his account out of earnings of the corporation did not constitute income, but to the contrary has reported those amounts as income for the years in which

the credits were made. The injection into the extended plan of an arrangement whereby additional compensation was so paid to employees does not in any way affect or change the purchase of Kelvinator Corporation stock by petitioner into the payment of compensation by the corporation.

The petitioner relies principally upon a decision of the Circuit Court of Appeals for the Eighth Circuit in *Omaha National Bank* v. *Commissioner*, 75 Fed. (2d) 434, which involved facts substantially similar to those of the present case. In the notice of deficiency herein the respondent stated that he was not following that case· and on brief counsel attempted to distinguish the two cases. We do not think the distinction pointed out, however, is of such nature that it requires or indicates the conclusion sought, and on authority of that case and *Delbert B. Geeseman, supra*, we decide this issue for the petitioner.

Upon receipt of the 3,000 shares of Kelvinator Corporation stock on December 1, 1934, petitioner sold 1,000 shares for $16,304.67, and the remaining question for determination is what percentage of the gain realized upon that sale is recognizable under the provisions of section 117 of the Revenue Act of 1934.[1] Under the statute the percentage of gain recognized is fixed by the length of time the petitioner "held" the stock so sold.

The petitioner makes three alternative contentions—one being that one-fourth of the 3,000 shares of Kelvinator stock acquired by the petitioner was acquired on December 1 of each of the years 1931 to 1934, inclusive; another, that the entire 3,000 shares of stock were held by petitioner from August 28, 1931, the date the extended option agreement was accepted by the petitioner; and the other, that so much of the stock was purchased at the time of the application of each earning credit as the said credit would pay for. The petitioner relies principally on the first alternative stated above, namely, that he purchased 25 percent of the entire 3,000 shares on December 1 of each year from 1931 to 1934, inclusive. It is the respondent's

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) GENERAL RULE.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

100 per centum if the capital asset has been held for not more than 1 year;

80 per centum if the capital asset has been held for more than 1 year but not for more than 2 years;

60 per centum if the capital asset has been held for more than 2 years but not for more than 5 years;

40 per centum if the capital asset has been held for more than 5 years but not for more than 10 years;

30 per centum if the capital asset has been held for more than 10 years.

(b) DEFINITION OF CAPITAL ASSETS.—For the purposes of this title, "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

contention, on the other hand, that none of the stock was acquired or held by the petitioner prior to the date of delivery on December 1, 1934.

The option agreement as amended provided that the shares should "be deliverable to participants on December 1, 1934" on payment of $8 per share, less the amount of the earning credits, as set forth in our findings of fact. It also provided that in the event a participant left the employ of the corporation prior to .December 1, 1934, he would be entitled to receive the amount of shares which the total earning credits theretofore actually applied would pay for at $8 per share, and, in addition, would have the right to purchase such number of shares of the total number allotted to him as had actually become purchasable upon the date he left the employ of the corporation. There was the further provision that any participant remaining in the employ of the corporation had the right at any time to demand and receive shares upon the same basis as a participant who had left the employ of the corporation, but upon the withdrawal of such shares, such participant would have no further right to purchase stock or receive future earning credits.

In *McFeely* v. *Commissioner*, 296 U. S. 102, in considering the definition of "capital assets" under section 101 of the Revenue Act of 1928 and referring particularly to the period during which property is "held", the Supreme Court stated in part:

In common understanding to hold property is to own it. In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding.

Originally there may have been some basis for the thought that the term "holding" contemplated possession as well as ownership. See *Ogle* v. *Helvering*, 77 Fed. (2d) 338. But, as we read *McFeely* v. *Commissioner*, *supra*, and the dissent thereto, any such restrictive interpretation of the statute has been rejected. See also *Helvering* v. *New York Trust Co.*, 292 U. S. 455. In the instant case certainly no participant in the stock purchase plan could acquire possession of any of the stock prior to December 1, 1934, if he was to continue as a participant to the extent of the total number of shares allotted to him. The extended agreement specifically provided, as we have noted, that the shares were to "be deliverable to participants on December 1, 1934." On that date a participant was to receive the total number of shares allotted to him upon the payment of a total purchase price of $8 per share, less the amount of earning credits actually entered to his credit. In the light of the language quoted from *McFeely* v. *Commissioner*, *supra*, our question is narrowed to whether or not the petitioner owned any of the shares of Kelvinator Corporation stock prior to December 1, 1934.

The first two of the alternative contentions made by the petitioner seem to us to be clearly without merit. At the time petitioner accepted the extended plan on August 28, 1931, he was the holder of an option to purchase 3,000 shares of Kelvinator Corporation stock, but we find no basis for concluding that he owned any shares prior to the date of payment or the application of earning credits. *Helvering* v. *San Joaquin Fruit & Investment Co.*, 297 U. S. 496. The same conclusion follows as to the second alternative to the extent that the allotments which became purchasable on December 1 of each year from 1931 to 1934, inclusive, were not paid for by the earning credits which had on those dates actually been applied on the petitioner's account or otherwise actually paid for. As to the third contention, however, we find merit in the petitioner's position. When earning credits were made by the Kelvinator Corporation to the accounts of its participating employees those employees certainly received valuable rights which to them and to the Kelvinator Corporation existed only in the form of Kelvinator stock. There was no alternative with either the employee or the Kelvinator Corporation. The employee had no right to take money or any property other than Kelvinator stock and the Kelvinator Corporation was obligated to deliver Kelvinator shares on demand. At the time of the entry of each earning credit the participating employee became entitled to the number of Kelvinator Corporation shares that the amount of earning credits so entered and applied would pay for at the rate fixed by the option agreement, even though delivery of the said shares was not to be made until December 1, 1934. Such a participating employee had the absolute right to demand delivery of the shares so paid for at any time. The respondent argues, however, that petitioner was not the owner of the shares at that time, inasmuch as possession of the shares so paid for could not be acquired except through sacrifice by the employee of all rights to thereafter participate in the plan and to acquire earning credits in the future or the right to purchase the remaining shares in his allotment which had not accrued on the date of taking down the shares already paid for. While it is true, as the respondent points out, that the employee would by demanding delivery of the shares already paid for lose his right to purchase the remaining shares and his right to subsequent earning credits, there is no way in which and no provision whereby such employee was ever to lose his right to the shares which had been paid for by the earning credits already applied to his account. In our opinion the petitioner's right was something more than a right to complete a purchase on December 1, 1934, of the 3,000 shares of Kelvinator Corporation stock and petitioner actually owned the shares purchasable by the earning credits actually applied from the

date of the credit, even though delivery of the certificates might be postponed to some subsequent date. Cf. *Harvey S. Strassburger*, 37 B. T. A. 881. We are also of the opinion that the petitioner became the unqualified owner of additional shares of Kelvinator Corporation stock on March 23, 1933, through the reduction of price from $10 to $8 per share to the extent that the amount of the earning credits previously applied actually purchased additional shares of Kelvinator stock. The period during which petitioner held the 1,000 shares sold should be computed in accordance with the conclusions stated.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

HILL, dissenting: I do not agree with that part of the opinion of the majority of the Board relating to the time of acquisition of the stock involved herein and the length of time it was "held" by him, in contemplation of section 117 (a) and (b) of the Revenue Act of 1934. It is my opinion that no part of the stock in question was held for more than one year and that 100 per centum of the gain realized upon the sale of 1,000 shares of the stock is recognizable for tax purposes.

I think the petitioner had no right to demand stock to the extent of the earnings credited to the purchase price of 3,000 shares and at the same time exercise his right to complete the purchase of 3,000 shares in accordance with the terms of the accepted option. He had the right to elect either to demand so much stock at the option price as the earnings credits would pay for and thereby forfeit his right to purchase under the option the remainder of the 3,000 shares, or to have the earnings credits applied to the purchase price of the full 3,000 shares—and not to a less number of shares. He could not do both. Petitioner elected the latter course and, having so elected, he must abide by the terms of the option for the purchase of the full 3,000 shares. Briefly stated, then, petitioner accepted an offer to purchase 3,000 shares of Kelvinator Corporation stock at $8 (originally $10) per share, or a total of $24,000, on condition that payment therefor was to be made as follows and not otherwise:

By crediting the proportionate annual earnings of such stock to the purchase price on the first day of December, 1931, 1932, 1933, and 1934, respectively, and the payment in cash on December 1, 1934, in the amount of the difference between the total of such earnings credits and $24,000, the total purchase price.

The payment was so made. The stock was deliverable only upon the completion of such payment on, or as of, December 1, 1934, and

was accordingly delivered. I think, therefore, that petitioner acquired the stock in the full amount of 3,000 shares on December 1, 1934, and that he neither acquired nor held any part of it prior thereto.

For the reasons assigned I respectfully dissent.

SMITH and MELLOTT agree with this dissent.