CHRYSLER CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 97305. Promulgated September 27, 1940.

*John W. Drye, Jr., Esq., Theodore Pearson, Esq.,* and *H. A. Mihills, C. P. A.,* for the petitioner.

*Ralph E. Smith, Esq.,* for the respondent.

### OPINION.

LEECH: This is a proceeding to redetermine a deficiency in income tax of $17,265.48 for the calendar year 1934 and deficiencies in income and excess profits taxes for the calendar year 1935 in the respective amounts of $382,560.24 and $139,112.82. Petitioner also asks findings of overpayment for both years. The issues are: (1) Whether petitioner realized income upon the termination of "Employees' Savings and Investment Plans", to the extent of stock and cash previously set aside for the purposes of the plans but not distributed to employees because of their having withdrawn from participation in the plans prior to the distribution dates; (2) whether amounts contributed by petitioner to the participants in the plans are deductible as ordinary and necessary business expenses incurred within the respective taxable years; (3) whether earnings contributed by petitioner to the "Chrysler Management Trust" are deductible as ordinary and necessary business expenses incurred within the taxable years; and (4) whether the prorated excess of the market price of certain stock sold by petitioner to the management trust over the selling price, is deductible as an ordinary and necessary business expense.

The case has been submitted on a lengthy stipulation and attached exhibits, which we adopt as our findings of fact. Only such facts as are deemed necessary to a disposition of this case will be referred to herein.

Prior to April 12, 1929, the president of petitioner, Walter P. Chrysler, appointed a committee from petitioner's board of directors to consider an employees' savings and investment plan and a profit-sharing plan. The committee presented its report, which recommended the adoption of plans for profit-sharing, bonuses, and savings and investment by employees, at a meeting of the directors on April 12, 1929. At this meeting, the directors approved the plans as recommended. Their action was ratified by petitioner's · stockholders on April 16, 1929, and the various plans were thereafter put into operation.

The employees' savings and investment plan was restricted to such employees of petitioner and its subsidiaries as had been employed for more than one year and whose annual compensation was less than $5,000. Its announced purposes were to encourage thrift and to attract and retain desirable employees. The report of the committee contained this paragraph:

This plan is not a bonus plan and participation is not measured by personal effort or achievement. It is recommended however in the hope and belief that it will reduce the turnover of labor, promote thrift, and encourage em-

ployees to become stockholders with the benefits to the Corporation resulting from their having such a financial interest. * * *

Employees desiring to participate were required to fill out the following application:

CHRYSLER CORPORATION

EMPLOYEES' SAVINGS AND INVESTMENT FUND

APPLICATION CARD

To _____   _____
             Name of Plant                              Date

Until further notice please deduct $_____ from my wages each month to be credited to my account in the Chrysler Corporation employees' savings and investment fund.

I hereby agree to abide by the rules governing said fund as they now exist or may hereafter be amended or altered.

_____     _____     _____     _____
Employee's Number       First Name         Middle Initial        Last Name

Deductions will be made once a month in amounts of $5.00 or multiples thereof.

EMPLOYEE'S RECORD

To be typewritten or printed

Employee's No. _____   Amount of Monthly Deduction $_____

Name _____
            First name                Middle initial            Last name

No. and Street _____ City _____

Plant _____
            Name of

Age _____   Nearest Relative _____

Date Employed _____ Date of application _____

Approved _____

A receipt for payments was given in the following form:

CHRYSLER CORPORATION

EMPLOYEES' SAVINGS AND INVESTMENT FUND

PAYMENT RECEIPT

                                        Date       No._____
Received from

For credit in the Employees' Savings and Investment Fund

NOT NEGOTIABLE            1929 CLASS            NOT ASSIGNABLE

Keep this Receipt
It must be surrendered when making withdrawal or at maturity of this class

Each eligible employee was permitted to deposit with petitioner 20 percent of his wages, but not in excess of $300 for any one year. For each dollar deposited by the employee, petitioner contributed 50 cents. The fund thus constituted, together with the income thereon, was invested in common stock of petitioner, purchased in the open market. This stock, together with any uninvested cash, was to be distributed to the participating employees four years later, subject to a proviso shortly to be mentioned. A separate fund or "class" was set up for each year. At the end of the year, the class for that year was closed, and four years later it would mature and distribution would take place. Any participant who should leave or be dismissed from the employ of petitioner before maturity of his class would receive only the amount of his deposits plus six percent interest, the remainder of the fund then standing to his credit being retained by petitioner. Participants could withdraw at any time, but would receive in that event only the amount of their deposits plus interest. The form of the withdrawal card was as follows:

Check Reason for—Withdrawal

| Leaving | Not Leaving |
|---------|-------------|
| Discharged | Sickness |
| Laid Off | Laid off temporarily |
| Quit | Other expenses |

CHRYSLER CORPORATION

EMPLOYEES' SAVINGS AND INVESTMENT FUND

WITHDRAWAL CARD

To_____    _____  _____
                    Name of plant                                      Date

                                                                Cross out
                                              partial           word which
I desire to withdraw within fifteen days $_____ complete   does not
                                                                apply.

Employee's No._____    Emp. Name_____
                                      First name    Middle initial    Last name
Mail to Street No._____
City and State_____
Witness_____
            Must be witnessed by employee authorized to accept withdrawals.

Most recent receipts must be attached. If lost, number, date and amount must be listed on back of this card.

Missing Receipts

| Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Remarks_____
_____

At the maturity of a class, participants could receive either their pro rata shares of stock and uninvested cash, or the total of their deposits plus interest. In the latter event petitioner retained the amounts contributed by it to the fund in respect of each employee so electing. The interests of participants were not assignable or transferable.

On October 16, 1930, petitioner's board of directors adopted a resolution providing that three individuals be appointed as agents of petitioner to hold shares of stock of petitioner for the respective classes of the employees' savings and investment plan, that shares of stock so held be transferred into their names as agents, and that the stock certificates be kept in a separate safety deposit box rented specifically for the purpose.

The payments made by the employees in each class in the year in which the class started were entered on petitioner's books as credits in an account entitled "Employees' Savings and Investment Fund— Class of 19—", which account was reflected on petitioner's balance sheets as a part of "accounts payable." As of December 31 of the year in which the class closed petitioner credited the class's account with an amount equal to 50 percent of the amounts contributed by the employees during the year. Appropriate interest was also duly credited. These credits were tentative and were subject to reversal in the event of an employee's withdrawal or his election to take cash at maturity instead of stock.

From time to time petitioner bought shares of its stock in the open market and carried it in the treasury stock account. From time to time, some of the shares were allocated to the various classes under the plan and were transferred to the names of the agents. When this was done, the treasury stock account was credited with the cost of the shares and the class's account was debited. The class's account was credited with dividends as they were received on this stock.

The results of the operation of the plan in respect of the classes of 1930 and 1931, which matured respectively December 31, 1934, and December 31, 1935, are shown by the following table:

| | Class of 1930 | Class of 1931 |
|---|---|---|
| Paid by employees in year class started | $324,845.00 | $298,685.00 |
| Employee's withdrawals | 144,725.00 | 126,720.00 |
| Amounts paid by nonwithdrawing employees | 180,120.00 | 171,965.00 |
| 50% contribution of petitioner | 90,060.00 | 85,982.50 |

On the maturity of each class, the nonwithdrawing employees received the respective amounts of cash and stock to which they were entitled.

The balances of the respective funds on hand after maturity and distribution, which resulted from withdrawals of participants, and which were retained by petitioner pursuant to the plan, were as follows:

|  | Class of 1930 | | Class of 1931 | |
| --- | --- | --- | --- | --- |
|  | Cash | Shares of stock | Cash | Shares of stock |
| Total on hand at maturity | $37,814.59 | 29,651 | $127,651.73 | 41,848 |
| Distributed to employees | 30,896.20 | 16,190 | 91,389.45 | 23,913 |
| Balance retained by petitioner | 6,918.39 | 13,461 | 36,262.28 | 17,935 |

The fair market value of the common stock of petitioner on December 31, 1934, was $42 per share and on December 31, 1935, was $92.50 per share.

At the maturity of each class, the stock retained by petitioner and then held in the names of its agents was transferred to petitioner's treasury account at par. None of the 13,461 shares or the 17,935 shares set out in the above table was sold or disposed of in 1934 or 1935. The cash balances retained by petitioner were debited to its capital surplus account.

During the calendar year 1930 the number of petitioner's employees entitled to participate in the class of that year was approximately 23,500, the number of such employees actually participating was 2,080, the number withdrawing prior to the maturity of the plan was 1,108, and the number of such employees remaining as participants in the class at the date of its maturity was 972. During the calendar year 1931 the number of employees entitled to participate in the class of that year was approximately 25,000, the number of actual participants was 2,237, the number withdrawing prior to maturity was 1,197, and the number remaining as participants at maturity was 1,040.

Petitioner received no deductions in years prior to 1934 for amounts credited to the classes of 1930 and 1931.

At the directors' meeting of April 12, 1929, another plan, known as the "Chrysler Management Trust," was also approved and adopted and later ratified by the stockholders. This plan consisted of a 10-year trust set up by petitioner for the benefit of the officers and executives of petitioner and its subsidiaries who were charged with the responsibility of carrying on and building up the business of the corporations. The purposes of the trust were stated in the preamble, as follows:

WHEREAS, the Corporation is desirous of adopting and carrying out a plan to attract and retain desirable officers and/or executives and to insure the permanency of sound and efficient management of the Corporation and its subsidiary corporations by enabling such officers and/or executives to become owners of stock of the Corporation on a basis favorable to them * * *.

The trust provided that petitioner would lend the trustees $3,000,-000, to be evidenced by a 5 percent promissory note, payable December 31, 1938, with which to purchase shares of petitioner's common stock. Petitioner agreed to sell the trust not exceeding 60,000 shares of its common stock at $60 per share, this price being considered low enough to protect the immediate equity in the trust against any likely depreciation in its future market value. Petitioner further agreed to pay over every year a percentage of its yearly earnings, computed in a manner not here material, to the trust.

All available trust funds, less the expenses of administration, interest on the note, and amounts distributed from time to time to beneficiaries, were to be invested in common stock of petitioner. The trustees were to set up two surplus accounts on their books. To "Surplus A" account were to be credited all amounts received as interest and dividends from trust funds. To "Surplus B" account were to be credited the annual payments received from petitioner and any profits arising from the sale or conversion of stock, securities or other property. The trustees could make distributions to beneficiaries from time to time out of "Surplus A" account. No such distributions were in fact made during 1934 or 1935.

The beneficial interest in the trust fund, divided into 30,000 parts, was evidenced by certificates for shares of beneficial interest. The selection of the officers and executives to whom these certificates were to be issued was placed in the hands of a "bonus committee" of three persons. Each officer and executive so selected was to receive a certificate for the number of shares allotted him upon paying to the trustees $25 in cash on account of each share. The certificates could be assigned only to petitioner and only in the event the employment of the participant was terminated. If the employment should have ceased by reason of the death or total disability of the participant or otherwise without his fault (of which the bonus committee was to be the sole and final judge), the participant or his estate would be entitled to receive the book value of his shares computed by taking the assets of the trust at cost, except that the common stock of petitioner would be taken at market. If the employment should have ceased for any other reason, the participant would receive the aliquot interest represented by his shares in the fund paid in by the beneficiaries plus an aliquot interest in the "Surplus A" account, plus

an aliquot interest in the "Surplus B" account, taking all the trust assets at cost for the purpose of computing these aliquot interests.

Petitioner was to retain any certificates of beneficial interest acquired from any holder or it might transfer them to other officers and executives selected by the bonus committee at prices determined by the latter. During the period of retention of such shares, petitioner was to have all the rights of a beneficiary.

The trustees were to be appointed and/or reappointed yearly by petitioner's board of directors.

Upon the termination of the trust, the trustees, after paying all sums due upon the note to petitioner and expenses of administration, were to distribute the balance of the trust estate pro rata to the holders of shares of beneficial interest, including petitioner if it should then be the holder of any such shares.

The creation of the trust and actions taken thereunder were not to give to any employee of petitioner or subsidiaries a right to be retained in any employment and all participating employees were to remain subject to discharge to the same extent as if the trust had never been created.

The trust, established on April 16, 1929, was duly placed in operation. On May 31, 1929, petitioner delivered 60,000 shares of its unissued common stock to the trust at a rate of $60 per share. Petitioner's common stock was then quoted at $68 per share. The excess of the quoted price over the sales price aggregated $480,000. At the time of the delivery of the stock, the trust issued to petitioner a note for $3,000,000, bearing interest at 5 percent, payable December 31, 1938, and secured by the 60,000 shares of stock.

The annual price range of petitioner's stock on the New York Stock Exchange is shown by the following table:

| Year | High | Low | Year | High | Low |
|------|------|-----|------|------|-----|
| 1929 | 135 | 26 | 1933 | 57⅝ | 7¾ |
| 1930 | 43 | 14⅛ | 1934 | 60⅜ | 29¼ |
| 1931 | 25¾ | 11¾ | 1935 | 93⅞ | 31 |
| 1932 | 21¾ | 5 | 1936 | 138¾ | 85½ |

In September 1929 and February 1930 the bonus committee made its initial selections and 28,470 shares of beneficial interest in the trust were issued to 105 individuals. Before the close of 1932, all of the remaining shares had been issued. Shares of beneficial interest of persons who ceased to be in petitioner's employ were duly reallotted by the bonus committee, 200 shares being so transferred in 1934 and 850 shares during 1935. Until 1935 all transfers were made from the former participants at $25 per share and were reallotted at the same figure. From early 1935 onward, the retiring participants were paid amounts in excess of $25 per share, and the new owners paid

amounts in excess of $25 per share for the reason that the distributive value of each share then exceeded $25.

During 1929 the trust purchased in the open market 23,150 additional shares of the stock of petitioner at a total cost of $857,191.25. Petitioner's 1930 earnings were insufficient to provide for any payments by it to the trust, but petitioner nevertheless appropriated $423,514.57 to the trust. Of this amount, $218,756.01 was expended by petitioner for stock in the petitioner, and the shares so bought were delivered to the trust in 1930. The balance was used by petitioner to purchase stock in the petitioner which was delivered to the trust in 1931. During 1931, petitioner transferred 43,300 shares of its stock to the trust at a price of $14.31 per share, subject to an option in petitioner to repurchase 20,000 shares at $14.31, each, whenever the stock of petitioner should be quoted at $90 or above. This option was terminated in 1935. During 1931, petitioner reduced the interest rate on the trust borrowings from petitioner from 5 percent to 1½ percent. The latter rate continued through 1935.

The trust pledged 103,300 shares of petitioner's stock to petitioner on December 31, 1933, as collateral security for notes payable of $3,322,015.16. The same number of shares were pledged by the trust to petitioner on December 31, 1934, as collateral security for notes payable of $3,140,655.54, and on December 31, 1935, 83,300 shares of petitioner's stock were pledged to petitioner as collateral security for notes payable of $1,680,913.43. During 1934 and 1935, the trust made no distributions among the holders of shares of beneficial interest.

The amounts of petitioner's earnings payable to the trust were as follows:

| | | | |
|---|---|---|---|
| 1929 | $611,444.34 | 1933 | $297,634.84 |
| 1930 | None | 1934 | 181,359.62 |
| 1931 | None | 1935 | 1,229,086.57 |
| 1932 | None | | |

Entries were made on petitioner's books as of December 31, 1934, and December 31, 1935, crediting the amounts payable for those years against amounts showing thereon as owing to petitioner by the trust.

The trust was amended on October 31, 1935, and December 2, 1938. The 1935 amendment was made because of petitioner's expressed desire to extend the period during which it would be advantageous for participants to continue in the employ of petitioner and disadvantageous for them to leave the employ. Provided enough participants assented, the trust was to be continued until December 31, 1942. Unanimous assent was subsequently obtained. Partial termination of the trust was to be effected as of various successive dates up to December 31, 1942. The 1935 amendment is material only to the

extent indicated herein. The 1938 amendment is not presently material.

The parties have stipulated that none of petitioner's employees participating in either the employees' savings and investment plan or the management trust were overpaid and that if it be determined that the amounts contributed by petitioner were paid or incurred in the taxable years and were additional compensation, such amounts were reasonable.

On March 10, 1938, within three years from the dates of all four payments of petitioner's 1934 income taxes, petitioner filed a claim for refund of 1934 income taxes. On June 15, 1938, within three years from the dates of each of the last three payments of petitioner's 1934 income taxes, petitioner filed another claim for refund of 1934 income taxes. The total amounts of income and excess profits taxes paid by petitioner for the calendar year 1935 were paid within three years before the filing of the petition in this proceeding.

Petitioner kept its books and filed its returns on the accrual basis.

Respondent seeks, first, to include in petitioner's 1934 and 1935 income the respective balances of the fund for the class of 1930 and the fund for the class of 1931 in the employees' savings and investment plan remaining on hand after distribution to those employees who had retained their participations. The amount which he proposes to tax to petitioner as 1934 income he computes as follows:

Value of stock received by petitioner on distribution by fund, 13,461
shares at $42 _____ $565, 362. 00
Cash received from fund _____ 6, 918. 39

Total received _____ 572, 280. 39
Contribution in 1930 _____ $162, 422. 50
Advances on employees' withdrawals _____ 144, 725. 00

Total investment _____ 307, 147. 50

Gain realized _____ 265, 132. 89

The amount which he seeks to tax to petitioner as 1935 income is computed similarly and is $1,419,187.28. These amounts are, of course, the portions of the respective funds which petitioner was entitled to retain. They arose either as a result of withdrawals of participants or because certain participants elected to take their deposits plus 6 percent interest in lieu of stock on the maturity dates of the classes. Upon the occurrence of those events, petitioner was relieved from its obligation to contribute 50 cents for each dollar paid in by the employees. It will be noted, petitioner has never had the tax benefit of any deductions for these contributions.

Respondent's theory is that petitioner paid out 50 cents per each dollar of employee contribution in order to obtain a right to receive the remainder of the funds and stock to which withdrawing participants would otherwise have been entitled. He urges that the right which petitioner thus "received" was the primary consideration for petitioner's assuming the management of each fund or class and obligating itself to make 50 percent contributions thereunto. It then follows, as his theory goes, that the excess of the value of what petitioner received over the amounts "paid", i. e., contributions in the year the class opened plus amounts paid to withdrawing employees, is taxable income to petitioner in the year of the maturity of each fund. It is an admitted corollary of respondent's position that a participating employee took title to his pro rata amount of stock the instant he joined the class and that at the termination of each class petitioner received something different from what it had before, namely, stock which had appreciated in value. Respondent cites *Helvering* v. *Clifford*, 309 U. S. 331, and *Higgins* v. *Smith*, 308 U. S. 473.

We think this position is unsound. Petitioner was not buying a right to receive stock *in futuro*. It was setting up a plan to reduce the turnover of labor and to encourage its employees to become stockholders, which latter event was expected to yield indirect benefits to petitioner because of the incentive to greater effort that comes to one who has a stake in an enterprise. Secondly, petitioner did not transfer its stock to each participant when the latter joined the class but, on the contrary, retained title, through its agents, to the stock set aside for the class. At the termination of the class petitioner did not receive something different from what it had owned previously, but was only obligated to pay less stock and money. It did not gain, it merely owed less.

The authorities cited by respondent for his position on this point contain language condemnatory of ingenious schemes hatched by taxpayers to divert or conceal receipt of income while actually enjoying its benefits. They are inapplicable here.

We think that two lines of authority entitle petitioner to prevail. The first of these is that an owner of property is not taxable on appreciation in its value while the property remains in his hands, that is, on *unrealized* appreciation in value. *Lynch* v.*Turrish*, 247 U. S. 221; *General Utilities Co.* v. *Helvering*, 296 U. S. 200. It is only when he has sold or disposed of the property that he becomes taxable on its increase in value. *Merchants Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509; *Eisner* v. *Macomber*, 252 U. S. 189. Petitioner never parted with the stock which was not required for distribution to participating employees. Therefore, to tax it on the appreciation in

the market value of the stock which had occurred at the termination date, over the amounts paid out under the plan to employees would clearly be taxing something which is not income.

There is a second ground supporting petitioner's position in the cases which hold that where a corporation contracts to sell its stock on the installment plan, installments forfeited to the corporation for nonpayment of the balance do not constitute income to the seller corporation, even though it never issues the stock. *Commissioner* v. *Inland Finance Co.*, 63 Fed. (2d) 886; *Industrial Loan & Investment Co.*, 17 B. T. A. 1328; *Illinois Rural Credit Association*, 3 B. T. A. 1178; *Realty Bond & Mortgage Co.* v. *United States*, 16 Fed. Supp. 771; 50 Harvard Law Review 697. Each withdrawing employee here forfeited his right to have petitioner apply an amount equal to 50 percent of his contribution to the purchase of stock to be distributed to him at the termination of the class.

Accordingly, we hold that petitioner is not taxable in respect of those portions of the employees' savings and investment plan funds which were not required for distribution to the employees in 1934 and 1935.

The second question is whether petitioner may deduct the amounts actually paid to the participating employees of the classes of 1930 and 1931 at the maturities of each class in 1934 and 1935 in accordance with the plan. The answer turns here on whether these payments were additional compensation to the participants and thus deductible by petitioner under section 23 (a) of the Revenue Act of 1934,[1] as ordinary and necessary business expenses. The answer to this query controls the disposition of the second and third issues and is important in the decision of the last issue. It is to be noted that petitioner is seeking deductions in respect of the employees' plans only in the years of the plans' maturities.

Nothing will be gained by attempting to add to what has already been written on this subject. Despite the possible difficulty of reconciliation of much of this discussion, it would seem clear that the question is entirely factual and that the answer is to be found in the intention of the parties to the particular arrangement in dispute, as disclosed by the evidence. *W. M. Ritter Lumber Co.*, 30 B. T. A. 231; *Delbert B. Geeseman*, 38 B. T. A. 258.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

In the case of *Gray & Co.* v. *United States*, 35 Fed. (2d) 968, where a corporation was allowed to deduct amounts paid to its executives in addition to their regular salaries, the extra amounts being computed on percentages of profits and hence contingent on the existence of profits, the Court of Claims pertinently said:

The policy of agreeing to pay a percentage of the earnings before they are earned, or even a sum in the nature of a bonus after they are earned, is based primarily upon sound business principles. It stimulates the activity, diligence and ambition of the employees in the case of a percentage of the profits, and in both the case of a percentage and of a bonus it enables the corporation to justly compensate its employees without beforehand incurring the obligation.

The stated purposes of the employees' savings and investment plan were: To promote thrift, to reduce the turnover of labor, to encourage employees to become stockholders, and to benefit petitioner indirectly by the incentive so provided to employees to exert their best efforts on behalf of petitioner and its subsidiaries.

Here petitioner intended to hold out inducements to its employees to buy stock at reduced prices and to continue in its employ with the added incentive of having a stake in the enterprise. Their ultimate receipt of stock and hence of the benefits accruing to them as a result of petitioner's contributions to the fund, depended on their continuance in petitioner's employ for a period of four years. Petitioner was bargaining for a reduced labor turnover and was willing to reward employees in the manner stated for continuing to perform services for it over a long period of time.

The contract between petitioner and the participants was not a purchase or sale either in form or in substance. Petitioner did not extend to its employees a mere option to acquire stock below the market price, the value of which privilege would fluctuate, but agreed to set aside an amount equal to 50 percent of each employee's contribution to the plan for the ultimate benefit of the participating employee. In consideration of participating and remaining in petitioner's employ, the particular employee received something definite to which he would not otherwise have been entitled. This, in our opinion, in addition to other evidence, worked such a change in the terms, conditions, and emoluments of his employment, as definitely to stamp the contested contributions to the employees' savings and investment plan as additional compensation to the participating employees. Cf. *Delbert B. Geeseman, supra.*

It follows that petitioner may deduct the amount of its contributions in connection with this plan, as ordinary and necessary business expenses incurred in the respective taxable years, under section 23 (a) of the Revenue Act of 1934, *supra.* *Hibbard, Spencer, Bartlett & Co.,* 5 B. T. A. 464; *Electric Storage Battery Co.,* 39 B. T. A. 121; *W. M. Ritter Lumber Co., supra; Alger-Sullivan Lumber Co.* v. *Commissioner,* 57 Fed. (2d) 3.

Similar considerations compel the same conclusion as to the amounts of annual earnings of the petitioner which were credited on its books as payable to the trust under the trust agreement.

We do not agree with respondent in his contention that the amounts of earnings contributed by petitioner to the trust were capital expenditures for rights to select the objects of its bounty, to reallot participations, to appoint and discharge trustees, etc. We think the amounts paid to retain the services of valuable executives clearly constituted additional compensation, under the principles laid down by the above-cited authorities.

However, the contested deduction as additional compensation, of the difference between the market value and the price at which petitioner transferred the 60,000 shares of its stock to the trust, must be denied.

If this differential were deductible by the petitioner as compensation paid, it is, of course, taxable as such to the recipient or recipients when received. Whether or not such differential constituted compensation is a question of fact, the answer to which depends upon the intention of the parties. *W. M. Ritter Lumber Co., supra; Delbert B. Geeseman, supra; Gordon M. Evans*, 38 B. T. A. 1406; *Electric Storage Battery Co., supra*.

The Board has ruled that similar transactions, in form sales, will be considered as such and not the payment of compensation in any amount, even though the price was below market, unless clearly shown to be otherwise. *Delbert B. Geeseman, supra; Gordon M. Evans, supra*. In addition, here, we have the presumption of correctness attaching to the determination of the respondent that this transaction was a sale at a price under the market and not the payment of compensation in any amount.

The transaction was, in form and substance, a sale. The buyer was the trust, not the employee. The stated purpose of petitioner in transferring the stock at a price below market does no more in the present circumstances than disclose a reason for the sale at a bargain in the elimination or at least reduction of speculative risk to the buying trust. In our opinion, the presumption of correctness attaching to the respondent's determination on this point has not been overcome. This record does not establish clearly that the transfer of this stock was not what it purported to be in form, a sale to the trust at a bargain price. It follows that no compensation was thereby paid by the corporation and it can thus deduct none. *Delbert B. Geeseman, supra; Gordon M. Evans, supra; Electric Storage Battery Co., supra*.

It is to be noted that we are here allowing petitioner, which was on the accrual basis, to deduct the amount of its earnings in the years in which they were irrevocably credited to the trust rather than at the

time of distribution of the trust assets to the beneficiaries, whereas the contributions of petitioner to the employees' savings and investment plan are allowed as of the time of distribution, on the authority of the *Electric Storage Battery Co.* case. The apparent inconsistency is justified by the fact that petitioner was obligated to pay over a fixed percentage of its earnings to the trust, a separate taxable entity, each year, whereas petitioner had no obligation to part irrevocably with its contributions to the employees' plan until the maturity of each class. See *Thurman* v. *Studebaker Corporation*, 88 Fed. (2d) 984; *Commissioner* v. *Texas Pipe Line Co.*, 87 Fed. (2d) 662.

We find that there was an overpayment of tax for 1934 and 1935, the exact amount of which will be determined under Rule 50.

Reviewed by the Board.

*Decision will be entered under Rule 50.*