The Patent Button Company v. Commissioner.
Patent Button Co. v. Commissioner
Docket No. 22750.
United States Tax Court
1952 Tax Ct. Memo LEXIS 281; 11 T.C.M. (CCH) 262; T.C.M. (RIA) 52081; March 25, 1952
*281 Truman Henson, Esq., 120 Broadway, New York 5, N. Y., for the petitioner. Melvin L. Sears, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner assails respondent's determination of a deficiency in excess profits tax for 1942 of $124,051.52. Concessions of the parties have disposed of several issues. The sole remaining question is whether a payment made by petitioner to its general manager during the taxable year is deductible as compensation or whether it constituted the purchase price of stock. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, a Connecticut corporation, with principal office in Waterbury, Connecticut, filed its returns with the collector of internal revenue for the District of Connecticut. It has kept its books and records and filed its returns on the accrual basis. Petitioner was incorporated in 1876. From that year until January 19, 1932, all of the stock of petitioner was owned exclusively by the members of not more than three families. Leonard R. Carley, hereinafter called Carley, was not connected or related to those families. *282 Since January 19, 1932, petitioner's stock has continued to be held by members of those families, except for the effect of transactions with Carley which give rise to this controversy, and except for one qualifying share which Carley held during his employment to permit him to be a director. A trust agreement dated December 26, 1924, to remain effective until 21 years after the death of the last survivor of the parties and their issue, stated that petitioner's stockholders assigned their shares to trustees to be held for their common benefit; that the trustees should hold legal title and act as attorneys for the stockholders with power to vote and to collect dividends for distribution; that each stockholder should hold an assignable trust certificate evidencing his interest with the right to sell his beneficial interest after offering the certificate to the other certificate holders at a price equal to 80 per cent of book value; that transferees accepting new certificates should be deemed to have assented to the terms of the agreement; and that the agreement might be terminated by action of holders of a five-sevenths interest in petitioner. In 1922 petitioner employed Carley under *283 a contract providing for a salary of $10,000 per year, plus an annual commission of 7 1/2 per cent on petitioner's first $200,000 of net income and 5 per cent of petitioner's net income in excess of $200,000. The agreement was to remain in effect until six months after notice of cancellation given by either party. Between 1922 and the close of 1930 petitioner's net worth increased by about $500,000. In March 1930 Carley instituted negotiations with petitioner proposing to reorganize or recapitalize petitioner, to take over all the common stock and to issue preferred stock to petitioner's stockholders. That proposal was rejected by petitioner's stockholders in the form of a counter-proposal that included an option to purchase 10 per cent of petitioner's stock at 80 per cent of book value. On July 15, 1930, Carley resigned, effective January 15, 1931. Thereafter negotiations were had between Carley and petitioner, with numerous proposals and counter proposals. In a letter dated September 8, 1930, Carley's attorney stated that Carley was prepared to accept in substance the proposals of petitioner's stockholders to the effect that Carley be employed as vice-president and general manager *284 at an annual salary of $15,000 plus additional compensation amounting to 10 per cent of the first $90,000, and one-third of the balance, of petitioner's "gross net income" before taxes. The letter further stated that Carley was prepared to accept the suggestion that the contract of employment include an option to purchase petitioner's stock and it expressed interest in the proportionate part of the total stock to be covered by the option, the option price per share, and the arrangements that might be made for disposal of the stock in the event of Carley's death or retirement. On January 7, 1931, Carley and petitioner entered into a tentative memorandum of agreement, and Carley withdrew his resignation. The tenative agreement provided for Carley's employment as of January 1, 1931, at a salary of $15,000 per year, plus a commission of 2 per cent of petitioner's annual net profits before taxes which was to be credited to Carley's loan account with petitioner. The tentative agreement stated that Carley agreed to purchase and petitioner agreed to sell one-tenth of petitioner's capital stock at 80 per cent of its book value as of December 31, 1930; that petitioner was to loan to Carley *285 without interest an amount equal to the cost of the stock; that Carley was to endorse and return the stock to petitioner to be held as collateral; that Carley should receive cash dividends on the stock and to exercise full voting power; that Carley should pay back to the Company one-third of the cash dividends received as payment on account of his loan; and that on Carley's leaving petitioner's employ or on his death, both petitioner and Carley should have the option to require a repurchase of the stock at the original price plus or minus 10 per cent of the increase or decrease in its book value. The tentative agreement further suggested for consideration the advisability of handling the stock transaction through a trustee who would hold the stock donated by the stockholders and issued to Carley, the trustee to receive in cash and hold the 2 per cent commission and one-third of the dividends which would be credited as payment on the stock, under which plan the transaction would not appear upon petitioner's books and a fund would be created to be used in case of repurchase. Between January 7, 1931, and January 5, 1932, negotiations were carried on to put the tentative agreement into *286 final form. At no time during negotiations was there any indication that the sale of petitioner's stock to Carley was not a bona fide sale of capital stock. At no time in the course of the negotiations was there any indication by any one that the sale of stock was intended to be a means of providing Carley with compensation which would be effectuated in the year in which he canceled the contract. On January 5, 1932, petitioner and Carley executed a written agreement, effective January 1, 1931, providing that Carley was to be employed as vice president and general manager at a salary of $15,000 per year, plus a commission of 2 per cent of the annual net profits before taxes. The agreement was to continue in force until six months after notice of cancellation given by either party, with the proviso that "No cancellation, however, shall operate to deprive any of the parties hereto of any rights hereunder which shall have accrued prior to the date of such cancellation, including specifically the ownership of ten per cent (10%) of the stock of the Company acquired by Carley under Article IV hereof." The agreement provided: "IV. (a) As an inducement and as one of the considerations for *287 the execution of this agreement by Carley the Company agrees to and does hereby sell, assign, transfer and set over to Carley out of the Common stock of the Company held in its treasury an amount of Common stock equal to ten per cent (10%) of the entire capital stock of the company issued and outstanding including treasury stock for the sum of One hundred and thirty-three thousand nine hundred and six and 65/100 Dollars ($133,906.65). The purchase price is not to bear interest and may be paid by Carley at any time at his option. It is understood and agreed, however, and Carley covenants and agrees that he will pay on account of the purchase price one-third of all dividends declared and paid upon the stock of the Company so sold to him, and also the entire amount of the additional annual compensation, consisting of two per cent (2%) of the net profits of the Company, hereinabove provided for. "(b) For the purpose of securing such payment Carley agrees to deposit with the Company the certificates representing said ten percent (10%) of the capital stock of the Company standing in his name but duly endorsed and ready for delivery and that the Company be and hereby is authorized empowered *288 and instructed to apply one-third of all cash dividends upon said stock to the payment of said purchase price and to pay the remaining twothirds thereof to Carley or upon his order. When and as stock is paid for by Carley the Company will, on request of Carley, deliver certificates therefor to him. In the event any stock dividends are declared the certificates representing such stock dividends upon the stock in the hands of the Company and not yet paid for, duly endorsed and ready for delivery, are to be deposited with the Company as additional collateral security for the purchase price of such unpaid for stock with like authority to the Company with respect to cash dividends thereon. All certificates of stock representing said ten percent (10%) of the stock of the Company purchased hereunder, as well as certificates representing stock dividends thereon and stock subscribed for are to be endorsed with the following legend: "'The shares of stock represented by the within certificate are issued in accordance with and subject to the options, covenants and agreements contained in agreement made the 29th day of December, 1931, between The Patent Button Company and Leonard R. Carley.' *289 * * *
"(g) As owner of ten percent (10%) of the stock of the Company purchased hereunder Carley shall, whether before or after completion of payment of the purchase price therefor, be entitled to a ten percent (10%) interest in all dividends, whether payable in cash, stock or otherwise, and all subscription and other rights from time to time accruing on the stock of the Company, subject, however, to the provisions of this agreement. "(h) Carley expressly and irrevocably authorizes and instructs the Company to retain the entire two percent (2%) of the net profits of the Company payable to him as additional compensation, and one-third of the cash dividends on said ten percent (10%) of the stock of the Company, the same to be applied by the Company on account of the payment of the purchase price of the stock purchased by Carley as hereinabove provided until the same is paid for in full." The instrument provided that Carley agreed to vote his stock in favor of any sale or merger approved by the other stockholders, and that the proceeds of such sale or merger attributable to Carley's stock should be turned over to him upon payment of the balance due on the purchase price of his *290 stock. The agreement also provided: "In the event that Carley should either voluntarily or involuntarily leave the employ of the Company for any cause or in case of the death of Carley * * *" the company agreed to repurchase at the option of Carley or his estate, and Carley agreed to resell at the company's option, "the said ten percent (10%) of the stock of the Company purchased by Carley as herein provided, including any stock dividends thereon, at the original purchase price thereof plus or minus any increase or decrease in the book value of said stock from January 1, 1931, * * * minus the amount of any of the original purchase price then unpaid, but such repurchase price shall not be less than the original purchase price less the amount of any payments that may have been made thereon under this agreement." The amount of $133,906.65 fixed by the agreement was determined by computing as of December 31, 1930, the book value of the stock to be issued, and taking 80 per cent thereof. A letter to petitioner from its accountant, annexed to the agreement when executed, set out the manner in which certain transactions were to be handled on petitioner's books. The letter stated that *291 entries affecting net worth would be avoided since net worth affected the repurchase price. The transaction was not to be shown as an increase in capital surplus, because delivery of stock by its shareholders to petitioner was to be simultaneous with delivery of the same stock to Carley. No entry was to be made to reflect any amount due from Carley for the purchase price of the stock which was stated to be in the nature of a contingent asset. All cash received toward the purchase price was to be reflected in a reserve for contingencies and to be held until full payment was completed. No entry was to be made to set up a contingent liability, in the amount of 10 per cent of net income not distributed by dividends, to reflect the contingency that if the value of petitioner's stock were to increase under Carley's management a percentage of that increase would have to be paid to Carley on a possible repurchase. On January 5, 1932, resolutions adopted by unanimous vote at special meetings of petitioner's stockholders and its board of directors provided for an increase in petitioner's capital stock from $48,000, consisting of 1,920 shares with par value of $25 each, to $480,000, consisting *292 of 19,200 shares with par value of $25 each. The resolutions authorized the officers to issue 17,280 shares of authorized unissued capital stock to stockholders or their nominee in the proportion of nine shares for each share outstanding, to transfer the sum of $432,000 from the surplus to the capital account, and provided that a certificate for 1,920 shares of such stock dividend should be issued in the name of and delivered to Carley as nominee for endorsement in blank and delivery by him to petitioner for its use and disposal under the agreement between petitioner and Carley. The contract with Carley was ratified. As a director and holder of one qualifying share, Carley was present and voted at both meetings. On January 19, 1932, pursuant to those resolutions, 1,920 shares of petitioner's stock were issued in the name of Carley and the certificate was endorsed by him and retained by petitioner. That stock was donated pro rata by petitioner's stockholders. This transaction was not shown on petitioner's books as an increase in capital surplus or otherwise. No amount or account was set up on the books to show any amount due from Carley. From 1934 to 1942, as contingent credits *293 were made against the purchase price, petitioner delivered certificates to Carley for certain of the stock, retaining endorsed certificates for the balance of the shares. Certificates for a total of 392 shares were so delivered to Carley up to the end of 1941. Certificates for another 232 shares were issued to him in 1942. All of the certificates retained by petitioner bore the restrictive legend provided for in the contract. 528 of the 624 shares issued to Carley did not bear the restrictive legend. No stock transfer stamps were affixed to any of the certificates issued by petitioner in the name of Carley. Carley was one of petitioner's directors at all times when such certificates were issued and delivered. The first two certificates issued bore the notations "No stamps due on this" and "No stamps," respectively. No stock transfer stamps were affixed to the 1931 tentative agreement or to the 1932 contract. The agreement was duly performed, and during each year in which it was in force petitioner paid Carley an annual salary of $15,000. During the period from 1932 to 1941, inclusive, petitioner paid to Carley the total amount of $36,096 which was equal to 6 2/3 per cent of the dividends *294 paid by petitioner on its stock for the years during which the agreement was in force. Those amounts were charged on petitioner's books to its Dividends Paid account and credited to its Cash account. During the same years petitioner credited Carley with the total sum of $18,048 which was equal to 3 1/3 per cent of the dividends paid by petitioner on its stock during that period. Those amounts were charged on petitioner's books to its Dividends Paid account and credited to its "Reserve for Contingent Liability - L. R. Carley, Dividends account." During the same years petitioner credited Carley with the total amount of $25,474.78, which was equal to 2 per cent of petitioner's net profits during that period, by charging such amounts on its books to its Commission account with a credit to its "Reserve for Contingent Liability - L. R. Carley, Commission account." Except for these credits in the sums of $18,048 and $25,474.78, Carley made no payments of any kind to petitioner for or on account of any purchase of stock. The two reserve accounts described above were closed periodically by charges to those accounts. The corresponding credits were made to a third account entitled "Reserve *295 for Contingent Liability - L. R. Carley, Stock Delivered." The amounts thus transferred represented shares of capital stock delivered by petitioner to Carley at a fixed price of $69.74304 per share. Entries to that effect were made periodically from 1932 to 1942. In the years prior to 1942 petitioner did not take deductions for any of the dividends paid to Carley totaling $36,096, or any of the dividends credited to Carley totaling $18,048. On its returns for the years 1936 and 1937, petitioner showed as dividends paid credits the full amount which it declared in those years. Petitioner deducted the commissions totaling $25,474.78, taking the deductions in the amounts and in the years that they were credited to Carley. On its returns for some years prior to 1942, in reporting compensation to Carley, petitioner stated him to be an officer, director, and owner of 10 per cent of its stock. Petitioner's returns for 1933 and 1934 were prepared by Chester P. Child, and the returns for 1935 to 1942, inclusive, were prepared by Harry E. Leonard. L. J. Hart and Alfred Hart executed the return for 1931; L. J. Hart and Carley executed the returns for 1932 to 1940, inclusive; Alfred Hart and *296 Carley executed the returns for 1941; and David Hart with L. J. Hart executed the returns for 1942. From time to time between 1932 and 1942, Carley attended meetings of petitioner's stockholders and voted the 1,920 shares of stock standing in his name. No one except Carley voted those shares during that period. On May 7, 1942, Carley warned petitioner that he would tender his resignation unless a new agreement could be reached because the existing arrangement was adversely affecting his financial situation. Previously, on April 27, 1942, Carley's attorney, William G. Gager, had written a letter to Carley with reference to the latter's contract with petitioner. Among other matters, Gager's letter stated: "While the contract was undoubtedly a fair contract at the time it was made, it is quite apparent that, due to radical changes in tax laws, further operation under the contract is practically prohibitive insofar as you are concerned. This is due to the fact that under the contract all of your commissions and one-third of your dividends must be applied to the purchase of stock, and there is no provision made for adequate cash with which to pay the income tax resulting from the *297 credit to you of these non-cash items." In a letter from Carley to petitioner, dated May 19, 1942, Carley gave petitioner formal notice of cancellation of the contract of January 5, 1932, exercising his option to require the company to repurchase his stock in the company, and offering to submit his immediate resignation if petitioner cared to waive the requirement of notice. During June 1942 petitioner's accountants conferred on three occasions with petitioner's tax counsel regarding the deductibility of past and future payments from petitioner to Carley and whether they should be treated as compensation. Resolutions were passed by petitioner's board of directors on July 14, 1942, and by petitioner's stockholders by unanimous vote on December 15, 1942, authorizing petitioner's officers to pay to Carley the sum of $80,339.56 in full discharge, as of January 1, 1942, of petitioner's obligations under the agreement of January 5, 1932, and for the assignment to petitioner of all rights in petitioner's stock held by Carley. The resolutions further authorized petitioner's officers to enter into a contract to employ Carley as vice president and general manager at a salary of $15,000 *298 per year, plus a commission of 4 per cent of petitioner's net profits computed before taxes. The minutes of the directors' meeting were read and approved at a subsequent directors' meeting on August 11, 1942, at which Carley was present. The stockholders' meeting was attended by Gager, as proxy for Carley's one qualifying share. On July 14, 1942, Carley executed a release which stated that in consideration of the sum of $80,339.56 Carley transferred to petitioner all his interest in its capital stock to which he might have claim under the agreement of January 5, 1932, and that he released petitioner from all further liability under that agreement. On the same day Carley endorsed the stock certificates which had previously been delivered to him. No stock transfer stamps were affixed to any stock certificates or to the release. Gager delivered to petitioner the release and endorsed stock certificates. On July 14, 1942, petitioner paid $80,339.56 to Carley. The payment was recorded in petitioner's journal on that day with a charge to "L. R. Carley Special." That account was opened as a new account on petitioner's books. As of December 31, 1942, petitioner made adjusting journal entries *299 on its books, the L. R. Carley Special account being credited with the amounts of $25,474.78 representing the past commissions paid, $18,048 representing one-third of the dividends paid, and $36,816.78 representing the 10 per cent increase in petitioner's net worth under the agreement, making a total credit of $80,339.56, which closed out that account. Other entries charged an account entitled "L. R. Carley Additional Compensation" with $36,096 representing two-thirds of the dividends paid, $18,048 representing one-third of the dividends paid, and $36,816.78 representing the 10 per cent increase in petitioner's net worth. On July 14, 1942, Carley returned to petitioner the sum of $2,560 representing dividends previously declared and paid to Carley during 1942 under the agreement of January 5, 1932. On July 14, 1942, Carley and petitioner entered into a new contract of employment, effective as of January 1, 1942, providing that Carley should be vice president and general manager, and that he should receive a salary of $15,000 a year, plus 4 per cent of petitioner's annual net profits before taxes. Petitioner filed returns for 1942 which stated that the purpose of the contract *300 of January 5, 1932, was only to provide for payment of compensation. On January 7, 1943, Carley's attorney wrote to petitioner's president stating that Carley would dispute any claim by petitioner that the contract of January 5, 1932, had not been intended to provide for a bona fide purchase-sale transaction. On February 16, 1943, Carley addressed a letter to petitioner in which he took exception to the method by which petitioner reported, in an annual statement and in returns for 1942 the payments made on termination of the contract. The letter stated that petitioner's treatment resulted from an after-thought to obtain a tax benefit; that it was contrary to the intent of the parties at the inception and during the existence of the contract; that Carley had reported prior dividends as such in his individual tax returns; and that petitioner's book entries did not properly represent the true tenor of the contract. In a letter to respondent dated February 16, 1943, Carley took exception to petitioner's statement on a return characterizing as compensation the payment in controversy made to Carley during 1942. On March 1, 1943, Carley resigned as a director and officer. On the same *301 day Carley sent a letter to petitioner giving formal notice of cancellation of the existing contract of employment. On March 9, 1943, petitioner's board of directors accepted his resignation. On April 13, 1943, Carley died. Since 1937 Carley's individual tax returns were prepared by Gager. His returns for years prior to 1942 showed, as ordinary income, salaries, and commissions under the 1932 contract, and the returns reported dividends from petitioner. His 1942 return showed the transaction in controversy as a sale of stock resulting in capital gain. In its returns for 1942 petitioner took a deduction, as compensation to Carley, in the sum of $90,960.78, which it obtained in a computation consisting of the addition of $36,096, $18,048, $25,474.78, and $36,816.61, with the subtraction from the total of $25,474.78. Respondent's notice of deficiency determined, among other matters, that: "The deduction of $90,960.78 for additional compensation paid to Leonard R. Carley has been disallowed in computing taxable net income for the reason that the agreement, together with an analysis of the transactions involved, indicates a repurchase of stock sold to Mr. Carley in 1931, and dividends *302 paid or credited to Mr. Carley in connection with this transaction constitute a part of the purchase price." Carley became a bona fide stockholder of petitioner on January 19, 1932, and continued as such until July 14, 1942. Petitioner's payment in 1942 constituted the sale price of stock sold to it by Carley, and was not compensation for Carley's services. Opinion To the growing list of adversary tax situations where two taxpayers are the true contestants and respondent is in effect no more than a stakeholder [1] this proceeding must be added. Naturally enough in the light of tax consequence there is a difference of opinion between petitioner, the employer, and those representing the employee as to whether the transaction in dispute was a purchase of petitioner's stock from the employee or merely a complicated method of paying him compensation to the deduction of which petitioner would be entitled. The question is essentially factual, see, e.g., Chrysler Corp., 42 B.T.A. 795, 806, and is settled by our ultimate finding that the true nature of the transaction was a stock purchase and not deductible compensation. As might be expected, great emphasis is placed by *303 the contending parties on contemporary acts supporting the one view or the other. The fact is that no consistent position was taken over the years by either party to the contract. For example, although neither party attached stock transfer stamps to any of the issued or repurchased stock, dividends were treated as a dividends-paid credit by petitioner and reported as income by the employee. [2]
It is, however, doubtful in the extreme whether the stock in question was transferred to the employee in the first instance by petitioner. Contemporaneous records make it at least equally probable that it was petitioner's stockholders who owned the *304 stock and who made it available, via petitioner, to the employee, notwithstanding that it was petitioner which contracted to repurchase the stock at the end of the employment, and not the stockholders. For this reason, and more especially because we are not here concerned with the original transfer of the stock but with its repurchase, a number of the cases in the same general field are inapposite. We have no present question for example, whether the original acquisition by an employee of stock or rights constitutes compensation at that time. Cf., e.g., Delbert G. Geeseman, 38 B.T.A. 258, with Commercial Investment Trust Corp., 28 B.T.A. 143, affirmed, per curiam (C.A. 2), 74 Fed. (2d) 1015. The contract quite apparently deals with employment and compensation for services as petitioner's excellent brief points out; and we may assume without deciding that the stock allotted to the employee as well as the commissions made available for him to buy it were current compensation for services rendered. What tends to the conclusion that petitioner's exercise of its option to acquire the stock did not result in additional compensation is that neither *305 party was compelled by the contract to sell on the one hand or acquire on the other although not unnaturally each had an option to do so. Under the contract which, after all, must be taken as expressing the basic arrangement, the stock, for all that any obligation existed, could have remained the employee's property indefinitely beyond the termination of his services. In addition, as we said in Kennington Realty Co., et al., 8 B.T.A. 1030, 1035: "* * * The record discloses that except for the limitations of the contract the gratuity stock was the absolute property of the employees to whom it was issued. They could vote it and they could and did receive distributions of corporate earnings * * *" See also A. Levy & J. Zentner Co., 31 B.T.A. 386. Here it is true the contract prevented petitioner from receiving in cash the full dividends payable on the stock allotted to him, but they were nonetheless posted to his credit. On the whole record we conclude that, although no doubt the stock was in the first place made available to the employee as some sort of incentive compensation to him, the optional repurchase at the termination of the employment even though *306 pursuant to the same contract was in reality what it purported to be, the sale and purchase of stock, and not a mere method of providing additional compensation. The consequence is that the deduction in question was properly disallowed. In order to permit the adjustment of issues not now contested, Decision will be entered under Rule 50. Footnotes
1. Cf., e.g., Ruth W. Collins, 14 T.C. 301; Robert Wood Johnson, 10 T.C. 647, 652↩. 2. "Petitioner having deliberately and knowingly considered and treated the accepted propositions as sales to the employees from the time of the acceptance, we do not think that it should now be permitted to regard them as something different for the purpose of enabling deduction to be made from gross income." Gardner-Denver Co. v. Commissioner, (C.A. 7), 75 Fed. (2d) 38, 40, certiorari denied, 295 U.S. 763↩.