Clarence L. Landen v. Commissioner.
Landen v. Commissioner
Docket No. 105984.
United States Tax Court
1943 Tax Ct. Memo LEXIS 510; 1 T.C.M. (CCH) 411; T.C.M. (RIA) 43019; January 14, 1943
*510 E. J. Svoboda, Esq., 1502 City Nat'l Bank Bldg., Omaha, Nebr., and Edwin Cassem, Esq., 1502 City Nat'l Bank Bldg., Omaha, Nebr., for the petitioner. A. R. Shannon, Jr., Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: This proceeding involves a deficiency in income tax for the calendar year 1937 in the amount of $8,242.99. The sole question is whether the exercise of an option for the purchase of stock, which had been given by a corporation to petitioner, resulted in the receipt by him of taxable income in the year 1937. Other adjustments made by respondent to the net income shown by petitioner's return are not contested. Findings of Fact Petitioner, a resident of Omaha, Nebraska, filed his income tax return for the year 1937 with the collector of internal revenue at Omaha, Nebraska. Securities Investment Corporation (hereinafter referred to as Investment) was incorporated under the laws of the State of Nebraska on April 1, 1924. Its incorporators were Francis P. Matthews and petitioner. The capital stock of the corporation was $25,000 which was owned in equal parts by the incorporators. Matthews was its president and treasurer but his *511 activity was confined to acting as counsel. Petitioner was vice-president, secretary and general manager. Investment conducted an automobile finance and small loan business. The business of Investment increased in volume and as the need for additional capital arose, its capital stock was increased. Prior to 1936, the stock of the company was not offered to the public. In 1925, W. H. Abmanson purchased some stock, which gave him a one-third interest. In December, 1928, Frank H. Woods and associates purchased some stock and thereafter each of the four groups - Matthews, petitioner, Abmanson and Woods - owned 25 percent of the stock. In the early part of 1936, Investment was faced with a need for operating capital. Plans were made to broaden its capital structure and to give the public an opportunity to invest in it. In January, 1936, negotiations were started with a firm of investment bankers in Boston for the flotation of a $500,000 bond issue. As the result of these negotiations an agreement was entered into on March 24, 1936, between this firm and Investment. The agreement was abrogated, however, when the lawyers for the bankers called their attention to a Nebraska law prohibiting *512 a Nebraska corporation from incurring debts in excess of two-thirds of its capital. While the above negotiations were in progress, petitioner expressed the desire to have an opportunity to purchase additional stock. On February 15, 1936, an agreement was entered into between him and Investment, the pertinent provisions of which are as follows: - WHEREAS the First Party has been employed as General Manager of the Securities Investment Corporation for a period of years; and WHEREAS the Second Party is desirous of inducing the First Party to continue in its employ as General Manager; and to induce him to do so, and as further consideration for service rendered to the Second Party by the First Party, in addition to the salary paid to the First Party by the Second Party, the Second Party desires to give to the First Party an option to purchase 12,500 shares of the common stock of the Second Party of the par value of $4,00 per share each; NOW, THEREFORE, in consideration of the mutual covenants, promises and agreements hereinafter contained, and of One ($1.00) Dollar in hand paid to the Second Party by the First Party, the receipt of which is hereby acknowledged, it is hereby mutually *513 agreed between the parties hereto as follows: First: The Second Party agrees to sell to the First Party 12,500 shares of its common stock of the par value of $4.00 per share, at the selling price of $4.00 per share, in amounts and at times as follows: 2,500 shares on or after January 1, 1937, but within 60 days of the completion of the annual audit of the Party of the Second Part for the year ending December 31, 1936; 2,500 shares on or after January 1, 1939, but within 60 days of the completion of the annual audit of the Party of the Second Part for the year ending December 31, 1938; 2,500 shares on or after January 1, 1940, but within 60 days of the completion of the annual audit of the Party of the Second Part for the year ending December 31, 1939; and 2,500 shares on or after January 1, 1941, but within 60 days of the completion of the annual audit of the Party of the Second Part for the year ending December 31, 1940; Provided, However, that if any year the First Party shall not purchase and pay for such allotment of 2,500 shares of the capital stock within 60 days after the completion of the annual audit of the Party of the Second Part in each year as hereinabove stipulated; *514 then, and in such event, the right of the Party of the First Part to purchase said 2,500 shares of the capital stock of the Party of the Second Part in that particular year shall terminate and cease; SECOND: The failure of the Party of the First Part to purchase the shares of stock available to him under this contract in any particular year shall not affect his right to purchase the shares of stock allotted to him in any subsequent year under the terms of this agreement; THIRD: The rights and privileges herein conveyed * * * shall not be negotiable or assignable; and are for the sole and exclusive benefit of the Party of the First Part; * * * * *
FIFTH: In the event employment of the Party of the First Part as General Manager of the Party of the Second Part should be discontinued, the right of the Party of the First Part to make any further or subsequent purchases * * * shall cease, * * *. At a meeting of the board of directors of Investment held on February 18, 1936, the following action was taken with reference to petitioner's salary: Then the matter of the salary of the general manager was discussed, and it was the general opinion of the directors present that the general *515 manager was entitled to a larger compensation than he had been receiving up to the present time. The compensation at this time is $1,250.00 per month. After a thorough discussion it was moved by Mr. Potter and seconded by Mr. Agee that until further action of the Board of Directors the salary of the general manager be fixed at $1,500.00 per month. This motion, upon being put, was unanimously adopted. The following is an excerpt from the minutes of a meeting of the board of directors of Investment held on March 28, 1936: The President then stated that in accordance with the previous discussion of the directors with the Vice-President and General Manager, Clarence L. Landen, it had been agreed that Mr. Landen was to have an option on 12,500 shares of the common stock of the Corporation, par value $4.00 each, to be purchased at the rate of 2,500 shares per year, beginning January 1, 1937, with the provision that the right to purchase any shares in any particular year would lapse unless exercised in the year designated; that an agreement embodying the terms of said option agreement between the Corporation and Clarence L. Landen had been drawn up and executed by Mr. Landen and the President *516 of the Corporation on behalf of the Corporation on February 15, 1936. This agreement was read to the Board of Directors. Whereupon, it was moved by Mr. Potter and seconded by Mr. Agee that the option agreement between the Securities Investment Corporation and Clarence L. Landen, dated February 15, 1936. * * *, be ratified and approved, and that the obligations of the Corporation under said contract be acknowledged and carried out as reflected by the terms thereof. This motion, upon being put to a vote, was unanimously adopted. On May 15, 1936, Securities Acceptance Corporation (hereinafter referred to as Acceptance) was organized by the directors of the directors of Investment under the laws of the State of Delaware. On May 28, 1936, Acceptance acquired all of the assets of Investment and assumed its liabilities. Thereafter Investment was dissolved. On May 14, 1936, prior to the reorganization, Investment and a Chicago firm of investment bankers (hereinafter referred to as Brokers) entered into an agreement which provided for the sale * of $500,000 convertible debentures and 6 percent cumulative preferred stock. This agreement was adopted by Acceptance on May 28, 1936. As compensation *517 for the underwrititing of the $500,000 convertible debentures, Brokers received 3,175 shares of the common stock of Acceptance having a par value $4of. The purchasers of the cumulative preferred stock received one warrant for each share purchased. The warrant conferred upon the holder the right to purchase 2 1/2 shares of common stock at $10 per share. Between June 1 and December 31, 1936, 317 shares were issued by Acceptance, as a result of the conversion of warrants at a premium of $6 or at the rate of $10 per share. Brokers included in income for the year 1936, at the rate of $8 per share, the 3,175 shares of common stock issued to them in connection with the underwriting. In computing the amortization of the cost of issuing the debentures, Acceptance valued the 3,175 shares of its common stock transferred to Brokers at $9.75 per share as at June 1, 1936, the date of issue of the debentures. At the meeting of the board of directors of Acceptance held on May 28, 1936, in which it approved and agreed to execute the agreement of May 14, 1936, between Investment and Brokers, a motion was duly passed that petitioner be granted an option to purchase 12,500 shares of $4 par value common *518 stock at $4 per share, at the rate of 2,500 shares each year beginning January 1, 1937, as provided in an agreement of May 20, 1936, between petitioner and Acceptance. The pertinent provisions of the agreement of May 20 are the same as those contained in the February 15th agreement set out above. Petitioner has exercised his right under the options in each of the years 1937 to 1941 inclusive, and at the time of the hearing still owned all of the shares so purchased. Acceptance, in its income tax return for 1937, deducted as compensation paid to petitioner the amount of $18,000. The fair market value of the common stock of Investment and Acceptance at the time the options were granted to petitioner in February and May 1936, was not less than $4.40 per share. The fair market value of the stock, when petitioner exercised his option to purchase 2,500 shares in February 1937, was $8 per share. The following is a schedule showing the salary received by petitioner from Investment and Acceptance for the calendar years 1927 to 1937, inclusive: 1927
$27,750.00
1928
23,550.00
1929
* Unknown
1930
13,200.00
1931
13,680.00
1932
10,740.00
1933
$10,800.00
1934
12,600.00
1935
14,700.00
1936
18,000.00
1937
18,000.00
*519 The percentage of the stock owned by petitioner in Investment and Acceptance from April 1, 1924 to December 19, 1936, is as follows: - April 1, 1927
50%
Dec. 31, 1924
50%
Dec. 31, 1925
33%
Dec. 31, 1926
33%
Dec. 31, 1927
34%
Dec. 31, 1928
25%
Dec. 31, 1929
24%
Dec. 31, 1930
24%
Dec. 31, 1931
24%
Dec. 31, 1932
25%
Dec. 31, 1933
25%
Dec. 31, 1934
25%
Dec. 31, 1935
25%
March 31, 1936
32%
June 30, 1936
33%
Dec. 19, 1936
33%
In determining the deficiency, respondent added $10,000 to the income reported by petitioner in his income tax return for 1937. He gave the following explanation: It is held that the transaction on February 26, 1937, whereby you received 2,500 shares of the capital stock of the Securities Acceptance Corporation having a fair market value of $20,000.00 upon p&yment of $10,000.00, gave rise to taxable income of $10,000.00. The transaction resulted from the exercise of an option contained in an employment agreement with the Securities Acceptance Corporation dated May 20, 1936. Inasmuch as you reported no income from this source, your net income is increased accordingly. Opinion Numerous cases have been decided *520 by the courts and the Board of Tax Appeals involving the question whether an employee, who has been permitted to purchase stock at a "bargain price," has thereby realized taxable income. The Commissioner's regulations [1] implement the rule established by the cases, which, stated generally, is: if property is transferred by a corporation to a shareholder or by an employer to an employee for an amount substantially less than its fair market value, the transferee shall include in his gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of compensation for services rendered or to be rendered. The present question therefore is whether the difference between the amount paid by petitioner for the 2,500 shares in February 1937 and their fair market value at that time constituted "compensation for services rendered or to be rendered." Respondent places his chief reliance upon the language of the option, especially the statement that it was "as *521 further consideration for services rendered * * * in addition to the salary paid." He therefore suggests that it is only reasonable to assume the option was granted to compensate petitioner for the years his salary was low and urges that we find as a fact that "the option resulted in payment of compensation for services rendered or to be rendered within the intendment" of the regulation. We have refrained from making the suggested finding for two reasons: first, it is in the nature of a legal conclusion; and second, but more important, in our judgment it is not justified under the evidence. The second reason will now be discussed. The history of the company, set out in brief outline in our findings, was shown at length in the evidence. Petitioner was one of its organizers, owned at all times a substantial portion of its stock, and was chiefly responsible for its growth and expansion. Its need for additional funds had made it expedient to take in additional stockholders; but petitioner was desirous of keeping his "traditional" interest in its stock if it was possible for him to do so. Early in 1936, he purchased three blocks of stock at prices ranging from $4.40 per share to $4.61 *522 per share. The evidence in connection with these purchases is the chief basis upon which finding has been made that the shares had a value of not less than $4.40 per share in February and May of 1936. (One option was signed in February and one in May.) Briefly, it shows that petitioner purchased from Woods a substantial portion of the shares owned by him - 6,250 shares on January 11, 1936, and the same number on March 3, 1936 at $4.40 per share - and on May 28, 1936, he purchased 1,406 shares at the same price from a trust company, which was acting as guardian of the estate of two minors. The latter sale required the approval of the probate court, which found the price to be "the present and fair market value * * * and the best * * * obtainable." On June 2, 1936, petitioner purchased 1,771 shares from the wife of a director of a financial institution, which had transacted business with the corporation and who was familiar with the value of the stock, paying her $4.61 per share. Respondent suggests that some of these sales were "distress" sales and therefore the price paid may not have represented actual value; but the evidence, in our opinion, does not support this view any more *523 than it supports petitioner's suggestion that he was paying more than the stock was actually worth, which, he says, was not in excess of par. Passing, however, the question of value it may be pointed out that petitioner was thus able to secure enough stock to hold what he considered to be his "traditional" interest in the corporation - i.e. to own approximately 33 per cent of its stock, as he had before Woods purchased some of it in 1928. But the corporation was in the process of reorganization, as a result of which it was contemplated (in May, 1936) that its outstanding stock would be increased approximately 35 per cent. Petitioner was unable to subscribe outright for one-third of such a large increase and sought the option as a means of protecting his position. The evidence shows that after having exercised the option in each of the years 1937, 1938, 1939, 1940 and 1941 he still owned approximately only 32 per cent of its total stock. This, then, tends to corroborate his statement that the option to purchase the additional stock was desired for the purpose of maintaining his proportionate interest in the corporation. It is true that the language of the option agreement indicates *524 it was given as compensation for services rendered; but all the surrounding facts and circumstances suggest the contrary. Thus Acceptance did not claim any deduction in its return for the year 1937 for additional compensation to petitioner by reason of the purchase of the stock and the several directors and attorneys testifying as witnesses were unanimous in their statements that they did not intend to grant petitioner any increase in his compensation other than the $3,300 voted to him in February, 1936. There was no discussion or folling on the part of any of them that he had been underpaid during the depression years. Moreover it is highly improbable any of them would have approved a net increase in salary equivalent to $13,000 a year to make up for what at most was an underpayment of not more than $2,000 or $3,000 per year. The parties seem to agree that at the time the option was exercised in 1937 the stock had a fair market value of $8 per share and finding to that effect has been made notwithstanding the fact we strongly suspect a part of it may have been fictitious or the result of "pegging." In this connection it is noted that, of the total 83,175 shares of authorized common *525 stock, 50,000 were reserved for the exercise of the conversion privilege incident to the debentures and 30,000 were registered with the S.E.C. only for the purpose of being deliverable upon exercise of warrants at $10 per share. Only 3,175 shares were to be sold immediately (except as the sale of convertible debentures and preferred stock with warrants attached should be made), and the 3,175 shares were issued to the brokers as part of their commission. They were therefore able to control, to some extent, the price at which the shares should be sold. Apparently the only other shares sold during the last six months of 1936 were 317 shares issued by Acceptance as a result of the conversion of warrants at $10 per share. Since Acceptance had valued the 3,175 shares issued to Brokers at $9.75 per share in computing amortization of the cost of issuing the $500,000 of convertible debentures and since the brokers had included the shares received by them in 1936 at $8 per share for income tax purposes and there is no evidence that the stock was worth less than that amount, finding that the shares had a market value of at least $8 per share when acquired by petitioner early in 1937 seems to *526 be justified,though it is not so clear that the word "fair" should be applied. But even assuming that the stock had a fair market value in May, 1936, of as much as $5 per share - in this connection it is noted that its book value was approximately that amount - and that it had a fair market value of $8 per share when purchased by petitioner at $4, we are not convinced that petitioner was in receipt of additional compensation for services. The option was prepared during what the witnesses characterized as a rather "hectic" period when the lawyers were striving to prepare, in the course of about three days, numerous documents and schedules in connection with registration with the Securities Exchange Commission. This was in February, 1936. At about the same time the directors gave consideration to the question of an increase in petitioner's salary from $1,250 per month to $1,500 per month and voted to allow it. They had also agreed, according to the testimony of the president, "that it was a wise thing * * * to put him in a position that if he cared to do so that he could maintain his position with the company." The two matters were kept separate at all times and none of the directors *527 intended that either should impinge upon the other. When it became necessary to reduce the option to writing no one paid any particular attention to the language in which it was phrased, but the document, as drafted by one of the lawyers, was executed. Under the circumstances we think petitioner's contention that the "legalistic verbiage" of the document should not be construed to override the actual facts and subject him to a tax upon "factitious, unrealized and unrealizable income" is sound. So far we have considered the question purely as one of fact. The applicable legal principles have been discussed in a number of cases. While normally a purchase of property, even at a "bargain price" does not result in the realization of income, Burnet v. Logan, 283 U.S. 404; Omaha Nat'l Bank et al. v. Commissioner, 75 Fed. (2d) 434, it may do so when the right to purchase the stock is granted for the purpose of augmenting the employee's compensation. Cf. Albert Russel Erskine, 26 B.T.A. 147; W. M. Ritter Lumber Co., 30 B.T.A. 231; Estate of Edward J. Connolly, 45 B.T.A. 374 *528 (on appeal C.C.A. 6 * ). Obviously stock or other property transferred to an employee as compensation for services is likewise income to him. Walter M. Priddy, 43 B.T.A. 18; Omaha Nat'l Bank et al. v. Commissioner, supra.Each case must be decided upon its own facts; Delbert B. Geeseman, 38 B.T.A. 258; Gordon M. Evans, 38 B.T.A. 1406; Charles E. Adams, 39 B.T.A. 387; Herbert H. Springford, 41 B.T.A. 1001; Rossheim v. Commissioner, 92 Fed. (2d) 247; and seldom do cases arise where the facts are entirely analogous. The line of demarcation is none too clear and, as suggested in the Springford case, supra, the conclusions reached in the decided cases may not always have been entirely consistent. The record in the instant proceeding is rather voluminous and no attempt has been made to set out all of the evidence upon which our conclusion has been based. It may be that a gain *529 will ultimately be realized by petitioner through a sale of the stock if - borrowing the language of the court in Omaha National Bank v. Commissioner, supra, - it has "not evaporated by that time." But however that may be the evidence convinces us petitioner was not in receipt of taxable income in the year in question. The sole issue submitted to us is therefore decided in favor of petitioner. Uncontested adjustments make a recomputation of the deficiency necessary. Therefore, Decision will be entered under Rule 50. Footnotes
*. Transcript incorrect.↩
1. Articles 22 (a)-1 and 22 (a)-3, Regulations 94, as amended by T.D. 4877↩, C.B. 1939-1, Part 1, p. 159.
*. BTA decision affirmed by CCA-6, 135 Fed. (2d) 64↩,