**OMAHA NAT. BANK et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 10035.

Circuit Court of Appeals, Eighth Circuit.

Feb. 8, 1935.

Floyd F. Toomey, of Washington, D. C. (Ellsworth C. Alvord, of Washington, D. C., on the brief), for petitioners.

Maurice J. Mahoney, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before SANBORN, WOODROUGH, and BOOTH, Circuit Judges.

SANBORN, Circuit Judge.

This is a petition to review an order of the Board of Tax Appeals redetermining a deficiency in the income taxes of F. J. Farrington for the year 1928. 29 B. T. A. 817. Mr. Farrington (who will be referred to as the taxpayer) died in 1932, and the petitioners are the executors of his estate. The facts out of which this controversy arises are stipulated. There is virtually no dispute as to the applicable law. The question is whether, in the year 1928, the taxpayer realized a taxable gain of $7500 or of $59,568.75, as the result of receiving 150 shares of the capital stock of Deere & Co.

For some twenty-nine years before his death, the taxpayer was the branch manager of Deere & Co. at Omaha, Neb. His employment was continuous. From November 1, 1911, until the 150 shares of stock were delivered to him in 1928, he had the right to purchase 500 shares of the stock of the company at $50 a share. Prior to April 8, 1918, this right was represented by written contracts and by notes given for the stock. It is not necessary to describe these contracts in detail. Undoubtedly he had been accorded this right of purchase because he was a valued employee of the company and it wished to retain his services. On April 8, 1918, a new contract for the purchase of stock was entered into by the taxpayer and the company, which, by its terms, superseded all previous agreements relative to the purchase of stock. By the terms of this contract, he was to buy, and the company was to sell to him, 500 shares of stock at $50 a share. The company was to credit upon the purchase price a sum equal to all dividends declared upon a like number of shares, and to deliver the stock to him when the credits equaled the purchase price, or whenever he paid the difference between the credits and the purchase price. If the credits did not amount to $25,-

000 by June 1, 1925, the company was, nevertheless, to deliver to him 100 shares "of said stock," and if by June 1, 1928, the credits did "not amount to the purchase price of the remainder of the stock covered by said contract" the company would deliver to him 150 shares "of said stock" in addition to the 100 shares previously delivered. "In either or both cases, i. e., on stock delivered in 1925 or 1928, the first party [the company] shall credit the second party [the taxpayer] with the difference between the sum of $50.00 per share and the credits actually made thereon. This contract, as to any stock not delivered in 1925 or 1928, as aforesaid, shall not be affected by such deliveries, and any stock remaining undelivered after June 1, 1928, will be delivered when paid for, as hereinabove provided."

The company declared no dividend prior to June 1, 1925, so that at that time no amounts had been credited to the taxpayer by the company under this contract. But the company, as it was bound to do, credited his account with $5,000 and delivered to him 100 shares of the 500 shares of stock which he had contracted to buy. By June 1, 1928, the taxpayer had received a credit of $225 on account of a dividend declared in that year, and the company gave him a further credit of $7,275, as it had agreed to do, and delivered to him 150 shares of the remaining 400 undelivered shares of stock. At that time the fair market value of the 150 shares delivered was $59,568.75.

The taxpayer assumed that what he had received from the company during the year 1928 in addition to his stipulated salary was the $7,500 credit upon his stock purchase contract, and he returned that amount as income.

The Commissioner took the position that the taxpayer had received as additional compensation the fair market value of the stock, and calculated the tax accordingly. Upon appeal, the Board of Tax Appeals sustained the Commissioner.

The Board was entirely justified in finding that whatever gain the taxpayer actually realized in 1928 from the contract with his employer was additional compensation for his services, but we are unable to avoid the conclusion that the realized gain was to be measured by what the employer credited the taxpayer with upon his stock purchase contract, and not by the market value of the stock delivered to him. The contract, as has already been pointed out, was made in 1918. The value of the 500 shares con-

tracted for was, as between the taxpayer and his employer, $50 a share. What the taxpayer's employer contracted to give him by way of credits upon the contract was: (1) All dividends declared upon 500 shares after the date of the contract; (2) on June 1, 1925, an amount which, together with dividend credits, would entitle the taxpayer to receive 100 shares of the stock contracted for, at the contract price; (3) on June 1, 1928, an amount which, together with dividend credits, would entitle the taxpayer to receive 150 additional shares of the stock contracted for, at the contract price. If in 1918 the employer had agreed to give to the taxpayer on June 1, 1925, $5,000 to be used to pay for 100 shares of the stock which he had purchased, and on June 1, 1928, $7,500 to be used to pay for 150 shares, the result would have been the same.

The Commissioner refers to the credit given in 1928 as an arbitrary credit. It was a credit which had been contracted for in 1918 and which the company could not have avoided giving the taxpayer. It was the equivalent of cash both to him and to the company. It paid in full for 150 shares of the 400 undelivered shares of the stock contracted for.

It is not easy to put out of mind the fact that by 1928 the stock which the taxpayer had purchased in 1918 had become worth far more than the agreed purchase price, and that the taxpayer had a large paper profit as the result of his contract, which profit he could have realized by selling his stock. But if, instead of being worth more than the contract price, the 150 shares received had been worth $2,000, and if the taxpayer had reported in his income tax return the market value of the stock as additional salary, instead of the $7,500 credited to him by his employer under the terms of the contract, would the Commissioner then have insisted that the $7,500 was a mere arbitrary credit? We think that he would not. He would very properly have contended that the company, by crediting the taxpayer with $7,500 in 1928, to apply upon the purchase price of the stock, had given him that much additional compensation, and that the taxpayer would not be entitled to a deduction for the loss represented by the difference between the $7,500 paid for the stock delivered to him and the $2,000 which it was worth, until that loss had been realized through a sale of the stock.

The Commissioner and the Board have treated the transaction here involved as one

in which the company in 1928 delivered 150 shares of stock to the taxpayer as additional compensation for services. They have disregarded the contract. The additional compensation which the taxpayer received was what he contracted for in 1918 and was the amount credited to him by his employer and with which he paid for the 150 shares of the 500 shares which he agreed to purchase. The difference between the amount of the credit and the fair market price of the stock was not a taxable gain realized in the year 1928, since the stock was not sold by the taxpayer in that year.

Concededly, if the company had, without any previous agreement or understanding, credited the taxpayer with $7,500 and delivered to him the 150 shares of stock as additional compensation for his services, the realized gain would be the fair market value of the stock. Rodrigues v. Edwards (C. C. A. 2) 40 F.(2d) 408; Appeal of James R. Lister, 3 B. T. A. 475; Charles R. Johnson v. Com'r of Int. Rev.; 8 B. T. A. 992; C. A. Tilt v. Com'r of Int. Rev., 14 B. T. A. 437; Old Colony Trust Co. v. Com'r of Int. Rev. (C. C. A. 1) 59 F.(2d) 168. But where the stock was delivered under contract of purchase and the taxpayer became the owner of it because of his agreement to purchase, the difference between what he paid for the stock and what the stock was worth was not a taxable gain. Gardner Governor Co. v. Com'r of Int. Rev., 27 B. T. A. 1171; Durkee v. Welch (D. C. S. D. Cal.) 49 F.(2d) 339; Rose v. Trust Co. of Georgia (C. C. A. 5) 28 F.(2d) 767; Taplin v. Com'r of Int. Rev. (C. C. A. 6) 41 F.(2d) 454; Commissioner of Internal Revenue v. Van Vorst (C. C. A. 9) 59 F.(2d) 677. It would become a taxable gain in the year that the stock was sold by the taxpayer, provided that the gain had not evaporated by that time.

The Commissioner seeks to distinguish the cases last cited upon the ground that in each of them the stock was paid for by cash or by deductions from wages or salaries. It would make no difference in principle how the stock was paid for so long as the sale was made in good faith and the employee actually paid for it. In this case the employee paid for his stock out of additional compensation contracted for in 1918 for the very purpose of enabling him to pay for at least 250 of the 500 shares by June 1, 1928. There is not the slightest claim or suggestion that at any time the taxpayer and the company acted otherwise than in the best of faith, or that there was any thought on the part of either of avoiding or evading any taxing statute.

The order of the Board of Tax Appeals is reversed.