HAROLD S. DIVINE AND RITA K. DIVINE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5339–65, 6667–66.   Filed October 25, 1972.

*George V. Delson* and *Arnold Broser*, for the petitioners.
*Daniel J. Boyer*, *Robert D. Grossman, Jr.*, and *Donald W. Geerhart*, for the respondent.

OPINION

FORRESTER, *Judge:* Respondent determined deficiencies in petitioners' income tax for the taxable years 1961 and 1962 in the amounts of $15,134.77 and $21,334.40, respectively, and also determined with respect to 1962 an addition to tax under section 6653(a)[1] in the amount of $1,066.72. Due to a number of concessions[2] the only two issues remaining for our decision are the following: (1) Whether the case of *Luckman* v. *Commissioner*, 418 F.2d 381 (C.A. 7, 1969), reversing 50 T.C. 619 (1968), has any collateral estoppel effect on this case; and, if not, (2) whether, with respect to a statutory stock option plan of Rapid American Corp. (Rapid), the difference between the option price and the fair market value of the stock at the time of the exercise of the option reduces Rapid's earnings and profits, so that certain distributions of property which Rapid made thereafter to petitioners were distributions of capital rather than dividends. All of the facts have been stipulated.

Petitioners Harold S. and Rita K. Divine resided in Great Neck, N.Y., at the time the petitions herein were filed. Using the cash receipts and disbursements method of accounting, petitioners filed joint Federal income tax returns for the calendar years 1961 and 1962 with the district director of internal revenue in New York, N.Y. Rita K. Divine is a petitioner in this case solely because she filed joint Federal income tax returns with her husband for the years in issue, and we will hereinafter refer to Harold S. Divine as petitioner.

During the years 1961 and 1962 petitioner owned, respectively, 37,000 and 40,000 shares of the common stock of Rapid. His total adjusted cost basis of these shares exceeded $18,501.40 in 1961 and $20,572.04 in 1962.

Rapid was incorporated under the laws of Ohio in 1902. Its common stock is listed on the New York Stock Exchange and is widely held.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.
[2] Petitioners, on brief, have specifically conceded the three subsidiary issues decided by us on remand in *Sid Luckman*, 56 T.C. 1216 (1971).

Throughout the years 1957 to 1963 it had more than 2,000 shareholders; as of January 31, 1963, there were 2,035,854 shares outstanding.

For the years prior to 1960 Rapid kept its books of account and filed its Federal corporate income tax returns on a calendar year basis. However, effective with the month ended January 31, 1960, Rapid secured the permission of the Internal Revenue Service to change its annual accounting period to a fiscal year ending January 31.

Rapid made cash distributions to its stockholders during its fiscal years ended January 31, 1962, and January 31, 1963, as follows:

| | | | |
|---|---|---|---|
| Mar. 30, 1961 | $175,324.70 | Mar. 30, 1962 | $256,638.00 |
| June 30, 1961 | 205,178.56 | June 29, 1962 | 256,638.00 |
| Sept. 29, 1961 | 206,765.28 | Sept. 28, 1962 | 256,638.00 |
| Dec. 20, 1961 | 253,571.99 | Dec. 28, 1962 | 254,922.93 |
| Total | 840,840.53 | Total | 1,024,836.93 |

Of these amounts petitioner received cash distributions totaling $18,501.40 during the calendar year 1961, dispensed at the rate of 50 cents per share per annum (12½ cents per quarter), as follows:

| Date distributed | Date received | Amount |
|---|---|---|
| Mar. 30, 1961 | Mar. 31, 1961 | $4,242.38 |
| June 30, 1961 | July 1, 1961 | 4,242.38 |
| Sept. 29, 1961 | Sept. 30, 1961 | 4,242.38 |
| Dec. 29, 1961 | Dec. 30, 1961 | 5,774.26 |

During 1962 petitioner received from Rapid cash distributions totaling $20,572.04, dispensed at the same rate as in 1961 as follows:

| Date distributed | Date received | Amount |
|---|---|---|
| Mar. 30, 1962 | Mar. 31, 1962 | $4,723.13 |
| June 29, 1962 | June 30, 1962 | 5,080.38 |
| Sept. 28, 1962 | Sept. 29, 1962 | 5,080.85 |
| Dec. 28, 1962 | Dec. 29, 1962 | 5,688.31 |

Petitioner followed Rapid's advice and did not report any of the above distributions as taxable dividend income on his Federal income tax return for either 1961 or 1962. Respondent concluded, contrary to Rapid's advice, that Rapid's earnings and profits were sufficient to render the distributions taxable dividends, and determined deficiencies accordingly.

Prior to the years here in question Rapid had issued to certain of its officers and key employees restricted stock options which came within the provisions of section 421 of the Internal Revenue Code of 1954. During the period from January 1, 1957, through January 31, 1963, these officers and employees purchased a total of 186,558 shares of Rapid stock by exercising their restricted stock options. Based upon quoted market prices at the dates of purchase, the total value of these

shares was $5,671,120. However, the exercise price of the options was such that Rapid received only a total of $2,044,748 in cash consideration for the stock. More detail with respect to the exercise of these restricted stock options is provided by the following table:

| Year ended | Number of shares issued | Amount received by Rapid | Market value at date of issue | Difference |
|---|---|---|---|---|
| 12/31/57 | 40,000 | $300,000 | $630,000 | $330,000 |
| 12/31/58 | 214 | 2,358 | 4,753 | 2,395 |
| 12/31/59 | 27,065 | 286,165 | 985,211 | 719,046 |
| 1/30/60 | 1,122 | 10,332 | 45,770 | 35,438 |
| 1/30/61 | 56,224 | 648,841 | 2,107,869 | 1,459,028 |
| Subtotals | 124,625 | 1,227,696 | 3,773,603 | 2,545,907 |
| 1/31/62 | 49,770 | 661,664 | 1,533,603 | 871,939 |
| Subtotals | 174,395 | 1,889,360 | 5,307,206 | 3,417,846 |
| 1/31/63 | 12,163 | 155,388 | 363,914 | 208,526 |
| Totals | 186,558 | 2,044,748 | 5,671,120 | 3,626,372 |

Rapid did not claim the difference between the market value of the stock and the amounts which it received therefor as a deduction on its Federal income tax returns. Also, it did not reduce by such difference either its earnings and profits or its accounting surplus on its books of account and annual financial statements.

If we view Rapid's restricted stock option plan as having no effect on earnings and profits, then Rapid's accumulated earnings and profits as of January 1, 1961, totaled at least $967,877.80, its current earnings and profits for the year ended January 31, 1962, totaled at least $1,169,889.30, its accumulated earnings and profits as of January 31, 1962, totaled at least $1,296,926.57, and its current deficit in earnings and profits for the year ended January 31, 1963, totaled up to $981,234.48. However, if we find that Rapid's restricted stock option plan does warrant reductions in earnings and profits, then Rapid's accumulated earnings and profits as of January 31, 1961, should be reduced by $2,545,907, its current earnings and profits for the year ended January 31, 1962, should be reduced by $871,939, and its current deficit in earnings and profits for the year ended January 31, 1963, should be increased by $208,526.

By granting the restricted stock options to its officers and key employees, the management of Rapid intended to compensate them and to give them an opportunity to invest in the stock of Rapid.

The legal issues and facts in this case are essentially identical to those in *Sid Luckman*, 50 T.C. 619 (1968), rev. 418 F.2d 381 (C.A. 7, 1969), the only exceptions being the nonidentity of the petitioners and the fact that *Luckman* involved only the taxable year 1961, whereas here we are faced with taxable years 1961 and 1962. Petitioner argues that respondent is collaterally estopped by the decision

of the Seventh Circuit in *Luckman* from relitigating the legal and factual issues in this case. Respondent contends that the mutuality-of-estoppel doctrine bars petitioner's reliance on collateral estoppel. Petitioner replies that the mutuality principle has been severely eroded by recent cases and should not be applied to this case.

Collateral estoppel has been appropriately termed "a very slippery concept." Griswold, "Res Judicata in Federal Tax Cases," 46 Yale L.J. 1322 (1937). Collateral estoppel is an aspect of the more general doctrine of res judicata. Merger and bar are the technical names for the aspects of res judicata which pertain to situations where a party seeks to relitigate a cause of action identical to one decided by a prior case involving the same parties. "Developments in the Law—Res Judicata," 65 Harv. L. Rev. 824 (1952). In such a situation the prior case is an absolute bar to further judicial inquiry into any matter which was or might have been offered therein to sustain or defeat the cause of action. *Cromwell* v. *County of Sac*, 94 U.S. 351, 352 (1876).

Collateral estoppel, on the other hand, pertains to situations where a suit is brought on a cause of action distinct from any action previously litigated, but involving certain issues identical with those resolved in a previous decision. In this type of situation only those matters actually controverted and essential to a final judgment in the prior action can be binding in the subsequent action. *Cromwell* v. *County of Sac, supra* at 353; Restatement, Judgments, sec. 68(2) (1942).

Collateral estoppel applies to legal issues as well as factual issues where, as in this case, a question of law is actually litigated and determined in one action, and then arises again out of the same transaction or subject matter in a subsequent action. Restatement, Judgments, sec. 70 (1942).[3] "Developments in the Law—Res. Judicata," *supra* at 843. The principles of collateral estoppel were specifically imported into Federal tax cases by *Tait* v. *Western Md. Ry. Co.*, 289 U.S. 620, 624 (1933).

The mutuality doctrine upon which respondent relies provides that a party may not invoke collateral estoppel to bind an opposing party by a prior judgment unless he himself would also have been bound by that judgment had it been decided the other way. Respondent was a party to the *Luckman* litigation and is thus bound by the decision therein, whereas petitioner was neither a party nor in privity [4] with a party and is not so bound.

---

[3] The Restatement prescribes that the parties must be the same in both actions. Sec. 70, comment b. However, this requirement is only an element of the mutuality doctrine, and is thus subject to petitioner's attack on the mutuality doctrine as a whole.

[4] "A privy is one who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase." *Bernhard* v. *Bank of America*, 19 Cal. 2d 807, 811, 122 P. 2d 892, 894 (1942); Restatement, Judgments, sec. 83; cf. *American Range Lines, Inc.*, 17 T.C. 764 (1951), affirmed on this issue 200 F.2d 844 (C.A. 2, 1952); *William A. Belcher, Jr.*, T.C. Memo. 1965–1.

Constitutional demands of due process require that the party against whom collateral estoppel is pleaded must have been bound by the prior decision. *Provident Bank* v. *Patterson*, 390 U.S. 102, 110 (1968); *Hansberry* v. *Lee*, 311 U.S. 32, 40 (1940); *Postal Telegraph Cable Co.* v. *Newport*, 247 U.S. 464, 476 (1918). No such constitutional mandate requires that the party invoking collateral estoppel be so bound. Nevertheless, the mutuality-of-estoppel doctrine has deep roots in the common law. It was roundly criticized more than a century ago by Jeremy Bentham as a maxim brought from the gaming table to the bench. Bentham, "Rationale of Judicial Evidence," in 7 Works of Jeremy Bentham 171 (Bowring ed. 1843). However, notwithstanding an expanding array of exceptions, the mutality principle remained an accepted element of our jurisprudence until 1942, when *Bernhard* v. *Bank of America*, 19 Cal. 2d 807, 122 P. 2d 892 (1942), extirpated mutuality of estoppel from the body of California law.

Since 1942 a growing number of courts and commentators have likewise rejected the mutuality doctrine, and have allowed collateral estoppel to be pleaded both offensively and defensively [5] by those who were neither parties nor in privity with parties to the prior action. See, e.g., *Zdanok* v. *Glidden Co., Durkee Famous Foods Division*, 327 F.2d 944, 954–956 C.A. 2, 1964), certiorari denied 377 U.S. 934 (1964); *Kurlan* v. *Commissioner*, 343 F.2d 625, 628–629 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court; *Provident Tradesmens B. & T. Co.* v. *Lumbermens Mut. Cas. Co.*, 411 F.2d 88, 92 (C.A. 3, 1969); *Seguros Tepeyac, S.A., Compania Mexicana* v. *Jernigan*, 410 F.2d 718, 726–728 (C.A. 5, 1969), certiorari denied 396 U.S. 905 (1969); *Bruszewski* v. *United States*, 181 F.2d 419 (C.A. 3, 1950), certiorari denied 340 U.S. 865 (1950); *Schwartz* v. *Public Administrator*, 24 N.Y. 2d 65, 298 N.Y.S. 2d 955, 246 N.E. 2d 725 (1969). See also Currie, "Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine," 9 Stan. L. Rev. 281 (1957); Currie, "Civil Procedure: The Tempest Brews," 53 Calif. L. Rev. 25 (1965).

The Supreme Court in 1936 accepted the mutuality principle without question in *Triplett* v. *Lowell*, 297 U.S. 638 (1936). However, the Supreme Court recently acknowledged the decline in the acceptance of the mutuality doctrine by overruling *Triplett* v. *Lowell*, *supra*, saying: "it is apparent that the uncritical acceptance of the principle of mutuality of estoppel expressed in *Triplett* v. *Lowell* is today out of

---

[5] We consider petitioner to be attempting an offensive use of collateral estoppel. Respondent's determination of deficiency is presumed to be correct and establishes the status quo. See *Welch* v. *Helvering*, 290 U.S. 111 (1933). By seeking to alter the status quo petitioner assumed the initiative. However, the distinction between offensive and defensive use of collateral estoppel has been largely discredited, even by the commentator chiefly responsible for its articulation. Currie, "Civil Procedure: The Tempest Brews," 53 Calif. L. Rev. 25 (1965). We therefore decline respondent's urgings to rest our decision solely on that distinction.

place." *Blonder-Tongue* v. *University Foundation*, 402 U.S. 313, 350 (1971).

In the cases which have come before this Court involving the question of mutuality we have voiced adherence to the mutuality principle, following the lead set by the Supreme Court in *Commissioner* v. *Sunnen*, 333 U.S. 591, 597 (1948), and *Tait* v. *Western Md. Ry. Co.*, 289 U.S. 620 (1933). See, e.g., *American Range Lines, Inc.*, 17 T.C. 764 (1951), affirmed on this issue 200 F.2d 844 (C.A. 2, 1952); *Charles M. Bernuth*, 57 T.C. 225 (1971); *Walter Wilson Flora*, 47 T.C. 410 (1967).[6] However, petitioner reminds us that appeal in this case will lie to the Second Circuit, and notes that in *Zdanok* v. *Glidden Co.*, *supra*, the Second Circuit disavowed the mutuality principle and permitted a plaintiff not bound by a prior judgment to successfully plead collateral estoppel.

We are mindful of the judicial trend which has undermined the principle of mutuality; thus, in view of *Zdanok* and the Supreme Court's reassessment of the mutuality principle in *Blonder-Tongue* v. *University Foundation*, *supra*, we have given careful consideration to petitioner's arguments that the mutuality doctrine should not preclude him from successfully invoking the doctrine of collateral estoppel against respondent. We have concluded that it would be wrong to lift the requirement of mutuality in this case for the reasons stated below, and thus we hold that respondent is not collaterally estopped by the *Luckman* case.

Petitioner relies heavily on the well-known *Zdanok* case in order to lend credibility to his position. However, in *Zdanok the Second Circuit's* construction of a unique collective bargaining contract affected only a very limited number of private parties. In the instant case the legal issue to be resolved—viz, whether the option spread of a statutory stock option reduces earnings and profits—could conceivably be raised by respondent in virtually identical form with respect to the shareholders of any corporation in the country with a statutory stock option plan. This marked difference in the breadth of the legal issues makes petitioner's reliance on *Zdanok* unavailing.

Courts and commentators alike have recognized the need for circumspection in removing mutuality of estoppel from jurisprudence, especially with respect to broad legal issues such as the earnings-and-profits issue herein. For example, the Supreme Court in *Blonder-Tongue* v. *University Foundation*, *supra*, couched its reappraisal of mutuality in narrow terms. See also *Provident Tradesmens B. & T. Co.* v. *Lumbermens Mut. Cas. Co.*, 411 F.2d 88, 92 (C.A. 3, 1969); Note, "Collateral Estoppel as to Questions of Law in Federal Tax

---

[6] See also *Matt R. Kane,* T.C. Memo. 1971–221.

Cases," 35 Iowa L. Rev. 700 (1950) ; Polasky, "Collateral Estoppel—Effects of Prior Litigation," 39 Iowa L. Rev. 217 (1954) ; Herbert Semmel, "Collateral Estoppel, Mutuality and Joinder of Parties," 68 Col. L. Rev. 1457, 1468 (1968) ; Note, "Collateral Estoppel: The Demise of Mutuality," 52 Cornell L. Q. 724 (1967).

The Restatement would allow the application of collateral estoppel to a legal issue only if it is actually litigated and essential to a judgment in one action, and then arises again out of the same subject matter or transaction in a subsequent action. Restatement, Judgments, sec. 70 (1942). For want of a better phrase, we will use the Restatement's term "same subject matter or transaction" to describe the necessary factual nexus between prior and subsequent cases. In *Zdanok* the proper construction of the same collective-bargaining contract was at issue in both the prior and subsequent cases, and thus the legal issue common to both cases plainly grew out of the same subject matter or transaction. Petitioner is in effect contending that the earnings-and-profits issue in the instant case grew out of the same subject matter or transaction as did the earnings-and-profits issue in *Luckman* because the same stock options are involved in both cases, and that collateral estoppel should be applied herein in the same manner as in *Zdanok*. While petitioner's position has a certain degree of superficial appeal, the overwhelmingly unfavorable results which would be produced by his position, together with the lack of any good reason to apply collateral estoppel herein, leads us to conclude that the result he seeks borders on absurdity.

It is elementary that respondent has the right to relitigate issues which have been decided against him in one or more circuit Courts of Appeals. Cf. *Hanover Bank* v. *Commissioner*, 369 U.S. 672, 675–676 (1962) ; *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971). This procedure is necessary because the overburdened Supreme Court tends to confine its review of tax cases until their ripeness is manifested by a conflict among the circuits. Cf. rule 19, *Rules of the Supreme Court*, 346 U.S. 967 (1963). Respondent's attempt in this case to secure a precedent contrary to the one already rendered by the Seventh Circuit is thus an example of an accepted and necessary practice in the development of our Federal tax laws. In fact, given the conflict-of-circuits rule, respondent will only rarely have the opportunity to fully and fairly litigate a tax law issue solely by contesting the first case in which it arises. Also, by sustaining petitioner's position we would be disrupting the uniformity in the application of the law within the jurisdiction of any circuit Court of Appeals which might disagree with the Seventh Circuit's holding in *Luckman*, because Rapid's shareholders throughout

the country would benefit from the collateral estoppel effects of *Luckman* regardless of the view taken by their own circuit.

Respondent is obliged to follow the above-described practice of re-litigating an issue which he feels has been incorrectly decided against him. This fact, together with the fact that respondent is always a party to tax cases, would make the total removal of the mutuality principle from tax law cases a far greater burden on respondent than on private parties. For example, if there had been a case prior to *Luckman* involving the same issue and yet another shareholder of Rapid, and it had been decided in respondent's favor by a different circuit, it could be of no collateral estoppel benefit to respondent in the instant case because petitioner would not have been bound thereby. However, such a case would not prevent petitioner from relying on the collateral estoppel effect of *Luckman*. Even if respondent had won 10 or more cases against various of Rapid's shareholders prior to *Luckman*, under petitioner's position he could still be harassed by the collateral estoppel effects of *Luckman*.

Presumably, petitioner would include only Rapid's shareholders under the umbrella created by his urged collateral estoppel effect of *Luckman*, thereby excluding all shareholders of any other corporation with a statutory stock option plan comparable to Rapid's.[7] Such being the case, respondent would not be foreclosed from relitigating the earnings-and-profits issue herein against a shareholder of such other corporation. Therefore, in order to uphold petitioner's position we would have to draw an unwarranted distinction between Rapid's shareholders and identically situated shareholders of other domestic corporations, thereby disturbing the uniformity in the application of the tax laws.[8]

Petitioner's justification for producing these unfavorable results is of course based solely on the fact that he held stock in Rapid at the same time as the petitioner in *Luckman*. However, we view the very tenuous and strictly fortuitous relationship between shareholders in a large public corporation as wholly insufficient to warrant such results.

Furthermore, we do not believe that any of the major policy considerations which normally call for the application of collateral estoppel are present in this case. Collateral estoppel is designed primarily to promote economy of judicial energies and stability of legal and eco-

---

[7] To include shareholders of other corporations would produce truly ludicrous results. The scope of collateral estoppel would be expanded beyond recognition, to the point where it would duplicate *stare decisis*. Furthermore, it would be an almost insurmountable task to construe the Restatement's phrase "same subject matter or transaction" to include option plans of other corporations.

[8] See Grover & Sternstein, "Res Judicata in Federal Administrative Law," 39 Iowa L. Rev. 300, 308, 316 (1954) ; also see Restatement, Judgments, sec. 70, comment *c* (1948 Supp.).

nomic relationships. *Commissioner* v. *Sunnen, supra* at 597; "Developments in the Law—Res Judicata," 65 Harv. L. Rev. 826 (1952).

Collateral estoppel promotes judicial economy by forestalling needless relitigation. The relitigation of the issue herein is not needless, but rather, as noted above, is an example of an accepted facet of our system of interpreting Federal tax laws. Therefore, judicial economy would not be advanced by holding respondent collaterally estopped herein, since respondent would simply await the ripening of another test case or cases on this same issue involving a shareholder of a different corporation.

Nor would stability be enhanced by invoking collateral estoppel herein, since, if the respondent's position is ultimately sustained, the collateral estoppel effect of the *Luckman* decision will come under further scrutiny. At that point respondent might even be able to renew proceedings against the petitioner in *Luckman* for a year other than than the one involved therein, due to the intervening development in the law (and assuming no other bars such as the statute of limitation). See *Commissioner* v. *Sunnen, supra; Bush* v. *Commissioner,* 175 F. 2d 391, 393 (C.A. 2, 1949). The situation of Rapid's other shareholders would likewise be subject to uncertainty, due to the same intervening legal development.

It is also important to note that petitioner herein is not being faced with redundant legal fees or harassment, two evils which collateral estoppel is designed to prevent.

Finally, although the doctrine of collateral estoppel is normally looked upon as promoting judicial efficiency, it can also produce undesirable results, such as the perpetuation of erroneous decisions, the hinderment of judicial flexibility, and the encouragement of overzealous litigation. "Developments in the Law—Res Judicata," 65 Harv. L. Rev. at 820 (1952). We believe that all three of these evils could result from the application of collateral estoppel to this case.

In sum, we feel that there is no basis upon which we can entertain petitioner's contention that respondent is collaterally estopped herein by the *Luckman* case.

The issue remaining to be decided is whether the earnings and profits of a corporation with a statutory stock option plan can be reduced by the amount of the aggregate difference between the option price and the fair market value of the stock at the time the options are exercised (such difference will hereinafter be referred to as the option spread at exercise). The determination of the effect of a statutory stock option plan on the issuing corporation's earnings and profits is important in this case because section 316 defines taxable corporate dividends as including only those distributions of property to shareholders which are made out of either current or accumulated earnings and profits. A dis-

tribution to shareholders when the corporation has neither current nor accumulated earnings and profits is regarded as a return of capital. Sec. 301(c). If petitioner were to prevail herein, the resulting reduction in Rapid's earnings and profits would cause the distributions which petitioner received from Rapid in 1961 and 1962 to be treated as a return of capital rather than as dividends.

Even though we are not bound by the doctrine of collateral estoppel to follow the Seventh Circuit's decision on this issue, petitioner urges us to accord it controlling weight under *stare decisis*. Since appeal in this case does not lie to the Seventh Circuit, we are free to either accept its view or hold to our own contrary view. *Jack E. Golsen, supra*. After thorough reconsideration of the issue presented in *Luckman* and now before us, and for the reasons set forth below as well as those enumerated in our opinion in *Luckman*, we respectfully decline to follow the holding of the Seventh Circuit in *Luckman*. We hold instead that, with respect to Rapid's statutory stock option plan, Rapid's earnings and profits were not reduced by the aggregate option spread at exercise.

Congress has never enacted a comprehensive definition of earnings and profits. However, a general rule has been judicially established that the great majority of items must be treated consistently in the computation of both taxable income and earnings and profits. *Union Equity Cooperative Exchange*, 58 T.C. 397 (1972); *Sid Luckman*, 56 T.C. 1216, 1223 (1971), on remand from 418 F. 2d 381 (C.A. 7, 1969); *Bangor & Aroostook Railroad Co.*, 16 T.C. 578, 584 (1951), affd. 193 F. 2d 827 (C.A. 1, 1951), certiorari denied 343 U.S. 934 (1952); *Corinne S. Koshland*, 33 B.T.A. 634, 641 (1935); *Benjamin Seigel*, 29 B.T.A. 1289, 1293 (1934).

Thus, the starting point when calculating a corporation's current earnings and profits is its taxable income. A number of adjustments are then made to this figure in order to account for certain special provisions of the Internal Revenue Code. *R. M. Weyerhaeuser*, 33 B.T.A. 594, 597 (1935). For example, interest from State and local bonds is ordinarily excluded from taxable income, but must be included in earnings and profits. See 1.312–6(b), Income Tax Regs. On the other hand, charitable contributions not allowed as income tax deductions do reduce earnings and profits. *Jacob M. Kaplan*, 43 T.C. 580, 599 (1965). For extended discussion on the adjustments to taxable income needed to calculate earnings and profits, see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.03 (3d ed. 1971); Andrews, " 'Out of Its Earnings & Profits': Some Reflections on the Taxation of Dividends," 69 Harv. L. Rev. 1403 (1956); Rudick, " 'Dividends' & 'Earnings or Profits' under the Income Tax Law: Corporate Non-Liquidating Distributions," 89 U.Pa. L. Rev. 865 (1941).

A great many of these adjustments have been developed by courts with little or no congressional guidance. In fact, Congress has upon occasion followed the lead of the courts and codified prior court holdings dealing with earnings and profits. See, e.g., *Commissioner* v. *Phipps*, 336 U.S. 410, 421 (1949); *Bangor & Aroostook Railroad Co.*, *supra* at 583; *Estate of Edward T. Bedford*, 1 T.C. 478, 481 (1943), reversed on another issue 144 F.2d 272 (C.A. 2, 1944), reversed and T.C. decision reinstated on another issue 325 U.S. 283 (1945); S. Rept. No. 2156, 74th Cong., 2d Sess., p. 19. The issue now before us is one which is not clearly resolved by resort to the Code, regulations, or prior cases, and it thus requires detailed analysis, especially in view of the disagreement between the Seventh Circuit and this Court.

In *Luckman*, we drew upon the legislative history of section 421 [9] and the language of section 421(a)(3) to aid us in reaching the conclusion that Congress had not intended the option spread at exercise of a statutory stock option to reduce earnings and profits. On appeal the Seventh Circuit reversed, holding that the "plain language" of section 421 called for a different result, and that our resort to legislative history was in "disregard" of that "plain language." 418 F.2d at 387. However, the only "plain language" of section 421 which could have any bearing on earnings and profits is the language of section 421(a)(3), which the Seventh Circuit regarded as inapplicable to earnings and profits. If we were to fully accept the Seventh Circuit's conclusion with respect to section 421(a)(3), and we do not, there would be no clear indication anywhere in section 421 of the intended effect of statutory options on earnings and profits. Our search for the "plain language" relied upon by the Seventh Circuit has been in vain.

We note the Seventh Circuit's observation that courts are not free to base a decision upon legislative history when the statute in question is clear and applicable. *American Community Builders, Inc.* v. *Commissioner*, 301 F. 2d 7 (C.A. 7, 1962).[10] However, we believe that *Luckman* and the instant case present situations where the need to resort to legislative history is manifest, especially in light of the Seventh Circuit's conclusion in respect of the applicability of section 421(a)(3). The legislative history of section 421 and an analysis of the cases which led to its adoption clearly support our holding in *Luckman*.

Prior to the enactment in 1950 of section 130A of the Internal Revenue Code of 1939 (the predecessor of section 421 of the 1954

---

[9] In 1963 Congress substantially revised the statutory treatment of stock options, effective Jan. 1, 1964. References made herein to sec. 421 are to that section as it read during 1961 and 1962, the years here in issue.

[10] This position may not be correct. See *Max Carasso*, 34 T.C. 1139, 1142 (1960), aff'd. 292 F.2d 367 (C.A. 2, 1961), certiorari denied 369 U.S. 874 (1962).

Code) Congress had left the income tax treatment of stock options solely to the courts. Two lines of cases had developed. One group of cases held that stock options were essentially compensatory in nature. *Commissioner* v. *Smith*, 324 U.S. 177 (1945); *McNamara* v. *Commissioner*, 210 F.2d 505 (C.A. 7, 1954); *Van Dusen* v. *Commissioner*, 166 F.2d 647 (C.A. 9, 1948); *Connolly's Estate* v. *Commissioner*, 135 F.2d 64 (C.A. 6, 1943); *Albert Russel Erskine*, 26 B.T.A. 147 (1932); see also *Commissioner* v. *Stone's Estate*, 210 F.2d 33 (C.A. 3, 1954); *Edward J. Epsen*, 44 B.T.A. 322 (1941); *W. M. Ritter Lumber Co.*, 30 B.T.A. 231, 274 (1934).

The other line of cases held that the purpose of stock options was to afford the issuing corporation's employees an opportunity to invest in its stock, and that the exercise of the option was therefore essentially a capital purchase transaction. These stock options were held to have no income tax consequences to the corporation or to the employee, either at the time of granting or at the time of exercise. *Rossheim* v. *Commissioner*, 92 F.2d 247 (C.A. 3, 1937); *Merhengood Corporation* v. *Helvering*, 89 F.2d 972 (C.A.D.C. 1937), certiorari denied 302 U.S. 714 (1937); *Bothwell* v. *Commissioner*, 77 F.2d 35 (C.A. 10, 1935); *Gardner-Denver Co.* v. *Commissioner*, 75 F.2d 38 (C.A. 7, 1935), certiorari denied 295 U.S. 763 (1935); *Omaha Nat. Bank* v. *Commissioner*, 75 F.2d 434 (C.A. 8, 1935); *Herbert H. Springford*, 41 B.T.A. 1001 (1940); *Charles E. Adams*, 39 B.T.A. 387 (1939); *Gordon M. Evans*, 38 B.T.A. 1406 (1938); *Delbert B. Geeseman*, 38 B.T.A. 258 (1938).

None of the cases cited above, nor any of the other cases to which our attention has been drawn (except *Luckman*), deals with the earnings-and-profits consequences of stock options to the issuing corporation. However, an analysis of the rationale underlying each line of cases gives an indication of how the respective courts would have ruled if the earnings-and-profits issue had been before them.

We have concluded that the line of cases which viewed the stock options at issue as noncompensatory would not have allowed a reduction of earnings and profits equal to the option spread at exercise. Their holding that the exercise of a stock option is simply a capital transaction would no more allow such a reduction than it would allow an income tax deduction.

Furthermore, most of these cases relied heavily on the fact that the market value of the stock at the time the option was granted was not substantially higher than the option price. They appeared to regard the option itself as the only consideration received by the employee, disregarding any increase in the value of the stock subsequent to the granting of the option. For example, the court in *Bothwell*

stated that the stock options there in issue "constituted a present consideration and not an agreement to pay for services in the future." 77 F.2d at 38.

Under this view, the only real economic outlay by the corporation is the value of the option which it transfers to its employees. Any subsequent value accruing to the employee is attributable solely to the fortuities of the stock market, and not to any cost incurred by the corporation. The employee is essentially being afforded a free opportunity to speculate in the stock of his employer, and it is solely the value of this opportunity which the corporation gives up. *If the corporation's earnings and profits were to be reduced at all, it logically would be by only the value of the option when granted.*

The other line of pre-1950 cases would probably have allowed a reduction of earnings and profits in respect of stock options. These cases viewed the stock options at issue as being compensation income to the employee and a compensation expense to the employer. However, these cases were not in agreement with respect to how the amount of the compensation should be measured. Some of the cases regarded the full option spread at the date of exercise as the amount of compensation involved. See, e.g., *Van Dusen* v. *Commissioner, supra,* and *Connolly's Estate* v. *Commissioner, supra.* In *Commissioner* v. *Smith, supra,* the Supreme Court also held that the entire option spread at the time of exercise was intended as compensation, but at the same time the Court declared that "It of course does not follow that in other circumstances not here present the option itself, rather than the proceeds of its exercise, could not be found to be the only intended compensation." Other cases did in fact hold that the amount of compensation was limited to the value of the stock option when it was granted. See, e.g., *McNamara* v. *Commissioner, supra,* and *Commissioner* v. *Stone's Estate, supra. Under this latter view, any reduction of earnings and profits would have been limited to the value of the stock option when granted.*

The pre-1950 cases cited above were decided, and distinguished, on the basis of the facts peculiar to each. Taken as a whole, they failed to draw a clear line between those stock options which would be considered compensatory and those which would not. The Income Tax Regulations governing the treatment of stock options were changed several times to reflect new decisions. T.D. 3435, II–1 C.B. 50 (1923); T.D. 4879, 1939–1 C.B. (Part 1) 159; T.D. 5507, 1946–1 C.B. 18; see also I.T. 3795, 1946–1 C.B. 15. In 1950 Congress addressed itself to this state of flux by enacting section 130A of the 1939 Code, which later became section 421 of the 1954 Code.

Essentially, section 130A defined with some precision a class of "restricted stock options" the exercise of which would be treated as

capital purchase transactions. The legislative history of section 130A clearly reveals Congress' intention that these statutory stock options be treated as incentive devices, thereby affording corporate employees an opportunity to obtain a "stake in the business."

> Your committee's bill * * * establishes a new set of rules for the tax treatment of certain employees stock options. Such options are frequently used as incentive devices by corporations who wish to attract new management, to convert their officers into "partners" by giving them a stake in the business, to retain the serv-ices of executives who might otherwise leave, or to give their employees generally a more direct interest in the success of the corporation.

> *     *     *     *     *     *     *

> Since the options which qualify for special treatment are regarded as incentive devices *rather than compensation,* no deduction is allowed the corporation under section 23(a) [of the 1939 Code, corresponding to section 162 of the 1954 Code] with respect to a transfer of stock pursuant to a restricted stock option. [Emphasis supplied.]

S. Rept. No. 2375, 81st Cong., 2d Sess., pp. 59–60 (1950), 1950–2 C.B. 526–527; see also Note, "Restricted Stock Options—Earnings and Profits," 39 U. Cin. L. Rev. 384, 386 (1970).

Congress also obviously felt that the use of stock options as incentive devices had been endangered by the Income Tax Regulations and the cases which had viewed stock options as being compensatory.

> At the present time the taxation of these options is governed by regulations which impede the use of the employee stock option for incentive purposes. Moreover, your committee believes these regulations go beyond the decision of the Supreme Court in *Commissioner* v. *Smith,* 324 U.S. 177 (1945). The resulting uncertainty as to whether these regulations are in accordance with the law is an additional reason for legislative action at the present time.

S. Rept. No. 2375, *supra* at p. 59. These concerns are embodied in the provisions of the statute, which provide that, with respect to a statutory option, the employee shall not recognize any income and the corporation shall receive no expense deduction. The treatment prescribed by Congress for statutory stock options follows closely the treatment which had been prescribed by those pre-1950 cases which had found stock options to be simply capital purchase transactions.

However, Congress of course realized that stock options had the potential to be used as mere compensation. As a result section 130A imposed certain restrictions on statutory stock options "for the purpose of excluding cases where the option is not a true incentive device." S. Rept. No. 2375, *supra* at p. 60. The effect of the restrictions was to remove, as much as possible, the compensatory potential of stock options. Only those stock options which met the statutory restrictions were assured tax treatment as capital transactions upon exercise. The statutory restrictions reflected many of the same considerations which had been present in the pre-1950 cases which had found stock options to be

noncompensatory. For example, Congress restricted the amount of allowable option spread at the time the option is granted. The lack of a substantial option spread at the time of granting had been one of the principal factors which had led courts prior to 1950 to characterize the exercise of stock options as capital purchase transactions. See, e.g., *Merhengood Corporation* v. *Helvering, supra; Bothwell* v. *Commissioner, supra; Delbert B. Geeseman, supra.*

This restriction, together with the other restrictions imposed by section 130A, had the effect of treating as incentive devices only those options with a nominal spread when granted. This concern with the value of the option when granted apparently reflected Congress' view that the taxable event should ordinarily be the granting rather than the exercise of the option. As noted above, this view had been implicit in many of the pre-1950 cases. By excluding from the statute's purview all options having more than a nominal value at granting, Congress could ensure that it wasn't merely creating another "loophole"; it could rest assured that any possible compensatory element which might be escaping taxation was truly nominal. Congress of course prohibited recognition of gain or expense at the time of the option's exercise as well as at the time of its granting. This was in recognition of the possibility that courts would shift the incidence of taxation to the time of exercise if an option had no readily ascertainable fair market value which could be taxed at its granting. Such an outcome would have frustrated the congressional efforts to *encourage the use of stock options in order to give employees a stake in their business.*

Congress left the tax treatment of nonstatutory stock options to the courts. S. Rept. No. 2375, *supra* at p. 60. Six years after the enactment of section 130A the Supreme Court resolved the conflict between the two lines of cases discussed above by holding that nonstatutory stock options are compensatory, and that if a nonstatutory stock option has no readily ascertainable market value when granted, then the employee must recognize as income the entire option spread at exercise. *Commissioner* v. *LoBue*, 351 U.S. 243 (1956). The Supreme Court thus applied the rationale of one line of cases to nonstatutory options, whereas the Congress had previously applied the rationale of the other line of cases to statutory options. In order to maintain symmetry in the tax laws, respondent has allowed corporations to deduct as a compensation expense the same amounts which the employee is required to include in income. Sec. 1.421-6(f), Income Tax Regs; Rev. Rul. 69–75, 1969–1 C.B. 52; Rev. Rul. 62–217, 1962–2 C.B. 59. Respondent has also conceded on brief that the earnings-and-profits consequences of nonstatutory options should parallel their income tax consequences.

In 1963 the President warned that, notwithstanding the restrictions imposed by section 421, statutory stock options were being used for

purposes not originally intended, and urged Congress to revise the method of taxing statutory stock options by treating the option spread at exercise as compensation income. Address by President Kennedy to Congress, January 24, 1963, U.S. Code Cong. & Adm. News 1445. Congress again rejected the characterization of statutory stock options as compensatory, and reaffirmed its prior position that statutory stock options are to be treated as incentive devices, i.e., as a means of giving employees a "stake in the business." S. Rept. No. 830, 88th Cong., 2d Sess., p. 88 (1964); H. Rept. No. 749, 88th Cong., 1st Sess., p. 64 (1963). However, Congress did make the statutory option provisions more restrictive to ensure that statutory stock options are actually used as incentive devices rather than simply as additional compensation. S. Rept. No. 830, *supra* at pp. 89–90. Later, while what is now section 83 was under consideration, Congress referred to these additional restrictions as "designed to decrease the compensatory nature of stock options and to place more emphasis on stock options as a means of giving employees a stake in the operation of their business." H. Rept. No. 91–413 (Part 1), 91st Cong., 1st Sess., p. 87 (1969); S. Rept. No. 91–552, 91st Cong., 1st Sess., p. 120 (1969).

In sum, the above analysis of section 421 and its antecedents forces us to the conclusion that Congress intended statutory stock options to be treated as capital purchase transactions for earnings-and-profit purposes as well as for income tax purposes. There is certainly no indication whatever, either from the legislative history or the "plain language" of the statute, that the earnings-and-profits consequences of statutory stock options should differ from the income tax consequences. Congress' characterization of statutory options as incentive devices followed an established line of judicial precedent holding the same view. The theoretical underpinning of the statute and the cases from which it was drawn are as applicable to the computation of earnings and profits as they are to the computation of income taxes. On the other hand, the earnings-and-profits treatment of statutory stock options urged by petitioner would be antithetical to the rationale underlying section 421.

We also believe that to allow an earnings-and-profits reduction equal to the option spread at exercise would allow employees holding statutory stock options even greater tax benefits than Congress explicitly provided. This compounding of benefits would occur because the reduction of earnings and profits accompanying the exercise of a statutory stock option could later inure to the employee's benefit if such reduction had the effect of characterizing a future distribution to such employee as a return of capital instead of a taxable dividend. Such a tax advantage is not ordinarily allowed unless express provision there-

for is made by Congress. See *New Colonial Ice Co.* v. *Helvering*, 292 U.S. 435 (1934); *White* v. *United States*, 305 U.S. 281, 292 (1938).

In further support of our holding we can draw upon a number of analogous situations involving nontaxable capital transfers of a corporation's stock where the earnings-and-profits treatment also follows the income tax treatment. For example, a distribution of a nontaxable stock dividend to the shareholders of a corporation does not reduce the issuing corporation's earnings and profits. Sec. 312(d)(1)(B); [11] *Walker* v. *Hopkins*, 12 F.2d 262 (C.A. 5, 1926), certiorari denied 271 U.S. 687 (1926); *Estate of Edward T. Bedford*, 1 T.C. 478 (1943), reversed on another issue 144 F.2d 272 (C.A. 2, 1944), reversed and T.C. decision reinstated on another issue 325 U.S. 283 (1945); *August Horrmann*, 34 B.T.A. 1178, 1183 (1936). However, taxable stock dividends do reduce earnings and profits, indicating that the income tax consequences of transactions involving a corporation's stock are significant for earnings-and-profits purposes. Sec. 1.312–1(d), Income Tax Regs. A contribution to the capital of a corporation also does not affect earnings and profits any more than it affects taxable income. *United Nat. Corporation* v. *Commissioner*, 143 F.2d 580 (C.A. 9, 1944), reversing 2 T.C. 111 (1943); Rev. Rul. 66–353, 1966–2 C.B. 111. Distributions pursuant to a nontaxable corporate reorganization also have no effect on earnings and profits. Sec. 312(d)(1)(A); *Commissioner* v. *Phipps*, 336 U.S. 410 (1949); *Commissioner* v. *Munter*, 331 U.S. 210 (1947); *Commissioner* v. *Wheeler*, 324 U.S. 542 (1945); *Commissioner* v. *Sansome*, 60 F.2d 931 (C.A. 2, 1932), certiorari denied 287 U.S. 667 (1932). See also *Bangor & Aroostook R. Co.* v. *Commissioner*, 193 F.2d 827 (C.A. 1, 1951), affirming 16 T.C. 578 (1951), certiorari denied 343 U.S. 934 (1952).

Underlying these cases and section 312(d) is a common policy which indicates that nontaxable transfers of a corporation's stock should not affect its earnings and profits. This policy stems in part from the unique nature of unissued stock as a corporate asset. It is an asset which can be created at will, and which produces neither gain nor loss upon exchange. Sec. 1032. Also, a corporation has no basis in authorized but unissued stock, and distributions thereof do not decrease the amount of existing assets or income distributable to the corporation's stockholders. See Jacoby, "Earnings & Profits: A Not So Theoretical Concept," 29th Ann. N.Y.U. Tax Inst. 662, 665 (1971).

[11] It is interesting to note that a literal reading of sec. 312(d)(1)(A) would resolve this case in respondent's favor. However, respondent has conceded on brief that the legislative history of sec. 312(d)(1)(A) renders it applicable only to corporate distributions to shareholders or security holders in their capacities as such. Respondent feels that the employee-shareholders of Rapid who received stock option distributions received them solely in their capacity as employees, and that sec. 312(d)(1)(A) is thus inapplicable to the instant case.

Petitioner founds a significant portion of his argument on the fact, already discussed above, that earnings-and-profits consequences of certain transactions sometimes differ from their income tax consequences. He maintains that the income tax treatment fashioned by Congress for statutory stock options is artificial and contrary to economic reality, and that the instant case is one where the earnings-and-profits consequences should differ from income tax consequences. He contends that, although section 421 (a) (2) directs that Rapid could not have deducted the option spread at exercise in computing its taxable income, Rapid should nonetheless be allowed to deduct such option spread in computing its earnings and profits. Petitioner cites *Commissioner* v. *LoBue*, *supra*, to establish the proposition that the stock option spread at exercise is "in economic reality" compensation income to the employee, and he argues from this that such spread must also be "in economic reality" a compensation expense which should reduce the issuing corporation's earnings and profits. The Seventh Circuit relied on *LoBue* in much the same manner as petitioner.

Petitioner's heavy reliance on *LoBue* is misplaced. *LoBue* essentially held that the option spread at exercise of a pre-1950 nonstatutory stock option was taxable as compensation to the employee. The Supreme Court in *LoBue* confined itself to an analysis of the definition of gross income embodied in section 22(a) of the Internal Revenue Code of 1939. It saw that a gain had inured to an employee, and taxed him on that gain because it fell within the very broad statutory definition of gross income. The Supreme Court's opinion did not deal with either earnings and profits or statutory stock options. Therefore, *LoBue* is not applicable to these facts and does not require any particular earnings-and-profits treatment of the statutory stock options here in issue.

In pursuing his "economic realities" argument, petitioner notes that Rapid could have accomplished the identical result it achieved with its statutory option plan through different means, but that it would then have been allowed a reduction of earnings and profits. The Seventh Circuit in *Luckman* also relied in part on this approach, noting that a reduction of earnings and profits would have clearly been allowed if the corporation had first paid its employees an amount in cash equal to the option spread at exercise, and then had the employees purchased stock at its fair market value. The Seventh Circuit maintained that the economic effect of the two different transactions would be identical, and that therefore the earnings-and-profits consequences should be identical. We must respectfully disagree.

The economic results of the two different methods would not necessarily be the same, since under the hypothetical posed by petitioner the employees would not be operating under the constraints which would exist under a statutory stock option plan. In enacting section

130A. Congress sought primarily to increase the ownership of employees in their employer corporation. This result would not be assured under petitioner's hypothetical, because the employees would apparently not be required to purchase the corporation's stock with the cash they would receive. And, if such a requirement were imposed, the transaction might so closely resemble statutory stock options as to be a sham.

Furthermore, as we noted above, the general rule is that earnings-and-profits computations follow income tax computations unless there is a compelling reason to do otherwise. We do not believe petitioner's "economic reality" theory warrants drawing another exception to the general rule. First, it is important to emphasize that in 1950 the fundamental character of stock options had not been settled. The judicial decisions, cited above, had only demonstrated that stock options combined two basic elements—a capital purchase element and a compensation element. The Congress took pains to minimize the compensatory element of statutory stock options so that it would be justified in taxing them solely as capital transactions. By going to the lengths that it did to remove the compensatory element from statutory stock options, we believe Congress must also have intended the earnings-and-profits consequences to parallel the income tax consequences. The Supreme Court's declaration in *LoBue* that nonstatutory options generate income in the amount of the option spread at exercise may have been partially due to the lack of any statutory safeguards to ensure that other nonstatutory stock options would not be used as mere compensation. In any event, *LoBue* did not deal with earnings and profits.

Second, even if we were to accept petitioner's assertion that statutory stock options are compensatory, we would still be unable to reach his conclusion that earnings and profits should be reduced by the full option spread at exercise. Instead, we believe that "economic reality" would dictate that the amount of compensation actually given up by the corporation must be measured when the statutory option is granted rather than when it is exercised. This view is certainly more consistent with the rationale underlying the line of cases which Congress followed in enacting the statutory stock option provisions. See Justice Harlan's partial dissent in *LoBue*, 351 U.S. at 250; and Jacoby, "Earnings & Profits: A Not So Theoretical Concept," *supra* at 664–665.

Petitioner also points to the statutory treatment of wash sale losses to support his position. Section 1091 disallows an income tax deduction for a loss from a wash sale, and section 312(f)(1) likewise prohibits a reduction of earnings and profits in respect of a wash sale loss. Petitioner argues that Congress would have been just as explicit if it had wanted to bar a reduction of earnings and profits for the amount of statutory option spread at exercise in addition to prohibiting a

172

deduction. However, the provision pointed to by petitioner was originally enacted by Congress in 1942 simply because it was afraid that the Revenue Act of 1940 might have altered the "uniform [judicial] practice prior to" the 1940 Act. H. Rept. No. 2333, 77th Cong., 2d Sess., p. 93 (1942). For further discussion of this point, see *Bangor & Aroostook Railroad Co.*, 16 T.C. at 585. If anything, the history of this provision lends support to our conclusion; it is yet another situation where Congress clearly indicated that the earnings-and-profits consequences of a nontaxable capital exchange should parallel the income tax consequences.

Because of concessions,

*Decisions will be entered under Rule 50.*

Reviewed by the Court.

QUEALY, *J.*, did not participate in the consideration and disposition of this case.

---

RAUM, *J.*, concurring: I agree with the conclusions of the prevailing opinion on both issues, i.e., (1) that collateral estoppel, a doctrine of limited scope in Federal tax cases, cf. *Commissioner* v. *Sunnen*, 333 U.S. 591, has no application here, where petitioner was neither a party nor in privity with a party in the prior litigation; and (2) that the stock options, which were not productive of taxable income to the employees, and which otherwise did not result in any recognizable or taxable gain or loss to the corporation, could not affect the earnings-and-profits account of the corporation. However, the opinion herein contains expansive discussions on both points, some of which may be unnecessary to the decision or dubious in character, and which should not be taken as binding upon the Court in other situations.

SCOTT, FAY, DAWSON, TANNENWALD, IRWIN, and HALL, *JJ.*, agree with this concurring opinion.